McCALEB, Justice.
 

 Plaintiff claims workmen’s compensation for total disability which he attributes to an accident sustained by him on August 3, 1960 when he was severely burned and shocked while in the performance of his duties as a slate man for Bird & Son, Inc., a national roofing concern. In paragraph 3 of his petition, plaintiff states:
 

 “Petitioner shows that on or about August 3, 1960, about 4:30 A.M., o’clock, while in the course and scope of his said employment on Aero Drive, Shreveport, Caddo Parish, Louisiana, domicile of his employer, while attempting to turn on the electrical switch to heat up the boilers, there was an electrical flash from the switch, causing severe shock and burns to the
 
 *1015
 
 ears, inside his mouth, back, shoulders, left arm, neck and right wrist, also eyes; that he lost consciousness; was taken to' Physicians & Surgeons Hospital, Shreveport, Louisiana, from the plant and treated by the company doctor, Dr. Jack B. Bird well.”
 

 As a consequence of the accident, plaintiff declares that he suffers from dizziness, blackout spells and weakness referred to as syncopal attacks due to orthostatic hypo-tension, commonly known as low blood pressure; that he suffered a blackout spell while at work on July 19, 1962; that as residuals of the electric shock he sustained severe adrenal damage resulting in a syndrome of weakness, asthemia, hypotension, electrolyte imbalance, lowered body temperature and easy susceptibility to disease and injury, all of which caused or contributed to the fainting spell or blackout of July 19, 1962, and that said blackout and fainting spell was attributable to the earlier industrial trauma of August 3, 1960. Plaintiff avers that, since July 19, 1962, he has been totally and permanently disabled from performing his usual duties and occupation or similar type duties and that this disability existed but did not fully develop until the blackout of July 19, 1962, all of which, as aforesaid, is attributable to the burns received by him in the accident of August 3, 1960. Pie alleges amicable demand and arbitrary refusal to pay and prays, therefore, for compensation for 400 weeks with interest from July 19, 1962 together with $2500 for medical and incidental expenses- and for imposition of statutory penalties- and reasonable attorneys’ fees pursuant to R.S. 22:658.
 

 Defendants, Bird & Son, Inc., and its-workmen’s compensation insurer, Employers Mutual Liability Insurance Company of Wisconsin, admit that plaintiff received burns to his head, back and arms on August 3, 1960 while in the performance of his-usual duties; that he was treated for his-injuries at Physicians and Surgeons PIospital in Shreveport by its doctors, Rushing and Birdwell, until August 5, 1960 and that he subsequently was under the care of Dr. J. P. Sanders until September 12, 1960, when he returned to work. It is also admitted that plaintiff was treated by Dr. Charles Walls who referred him to Dr. Dan E. Russell, an internist, and that a medical report was sent to the defendant insurance company. All other allegations of plaintiff respecting his total permanent disability since July 19, 1962 were denied and defendants also filed a plea of prescription of one year under R.S. 23:1209.
 

 After a trial on the issues thus formed by the pleadings there was judgment rejecting plaintiff’s demands. The plea of prescription was never passed on by the trial judge as he concluded as follows:
 

 “While we have been unable to reach a conclusion as to how plaintiff received
 
 *1017
 
 his burns, plaintiff has failed to prove that he received an electrical shock, the basis of the opinions of all the doctors who testified that he was at the time of the trial disabled to such an extent that he could not perform the duties that were required of him while an employee of Bird and Son. And having failed to prove any of his alternative allegations of injury the demands of the plaintiff are rejected.”
 

 On appeal this judgment was affirmed. See Russell v. Employers Mutual Liability Ins. Co. of Wis., 160 So.2d 261. The Court of Appeal adopted the opinion of the trial judge and concluded:
 

 “After a careful review of the record, we approve of the decision as reached by the trial court, and hold that plaintiff has not established that his injuries were caused by electrical shock. Without proof of this fact, the disabilities of which he
 
 now com
 
 plains are not shown to be causally connected with the accident.”
 

 On application of plaintiff we granted certiorari, 245 La. 817, 161 So.2d 283 and the case has been argued and submitted for our decision.
 

 The gravamen of the opinion of the district court which, as stated, was adopted by the Court of Appeal, is that, since all of the doctors who treated plaintiff (except two, Drs. Rushing and Birdwell, company doctors who examined plaintiff on the date of the accident,) were informed that plaintiff had suffered burns caused by electric shock, their medical opinions that plaintiff now suffers total permanent disability as a result of the accident of August 3, I960' are of little or no probative value inasmuch as the defendants proved that there was no malfunctioning of the electrical equipment in the “Bee Hive Room” where the accident occurred and, therefore, plaintiff failed to establish his case by a reasonable preponderance of the evidence.
 

 Plaintiff’s position is that he was not required to prove that his disability is attributable to electrical burns; that it was sufficient for him to show that it is due to the accident of August 3, 1960 and that it is immaterial whether it stems from electrical shock or from thermal burns and shock.
 

 It is not disputed that plaintiff received burns while working in what was called the “Bee Hive Room” on August 3, 1960. This room is described by Carter Sexton, maintenance man and electrician for Bird & Son, as having dimensions of twelvc-by-twelvc feet with three or four levels. The room contains a large mixer in which asphalt is mixed with powder or filler and then is conveyed to a lower floor. There is also a pump through which the asphalt is conveyed into this mixer. These mechanisms are operated electrically, controlled by six switches plus two transformers on the top level. According to Sexton, the nearest
 
 *1019
 
 gas burning machine or apparatus is a gas jet on the level below.
 

 Plaintiff had been employed by Bird & Son for 16 years prior to the accident of August 3, 1960. His principal work was with machinery which heated the boilers and started the mixers on the early morning shift. He was attending to that chore in the “Bee Hive Room” at about 4:30 a. m. when he last recalled reaching for an electrical switch therein and later was seen by one Cook, another employee, emerging from that room in a haltering manner and in a daze. Cook, upon reaching plaintiff, noticed that his face was burned and that his eyebrows and sideburns were singed to his cap. Plaintiff was then taken to the P & S Hospital where the bums were diagnosed by Drs. R. E. Rushing and Jack Birdwell, Bird & Son’s regular physicians, as first and second degree flash bums, the hospital report showing that he received the burns at work when a kettle exploded, no mention being made of an electrical burn or shock. Dr. Birdwell treated plaintiff for three days but plaintiff was dissatisfied with the treatments and requested to be released, although he was not well. On August 6th, plaintiff consulted Dr. Jason P. Sanders and his son, Dr. J. C. Sanders, at Sanders Clinic in Shreveport and was treated by them until September 12, 1960, when he was allowed to return to work. The elder Dr. Sanders testified that plaintiff told him that the accident occurred when he was attempting to turn on one of the switches and had some difficulty with it; that there was a flash of some sort, an electric flash, and then he blacked out or lost consciousness.
 

 It is shown by the testimony of six doctors that plaintiff has been suffering from orthostatic hypotension or syncope since the accident. These are Doctors J. P. Sanders, J. C. Sanders, Charles Walls, Dan E. Russell, William M. Allums and Frank T. Dienst, Jr.
 
 [1]
 
 Indeed, the defendants do not seriously contend that plaintiff has not been totally, permanently disabled since July 19, 1962. The crucial question is whether the existing disability is causally connected with the accident of August 3, 1960. Although much of the medical opinion is based on the assumption that plaintiff received burns from an electrical shock (as he, we think, actually believed to be the case) there is convincing medical opinion to the effect that the syncopal attacks and orthostatic hypotension could be causally connected with the industrial trauma (first, second and third degree thermal burns) accompanied by shock. Indeed, aside from anything else, we believe that, since there is strong circumstantial evidence showing that
 
 *1021
 
 plaintiff had never before the accident suffered from blackouts, dizziness, infections and other symptoms connected with hypo-tension or low blood pressure, it is plausible to deduce, in accordance with the testimony of at least two or three of the doctors, that plaintiff’s present disability has causal relationship to the burns and resulting shock he sustained August 3, 1960.
 

 Plaintiff’s prior good work record is avouched by Mr. Frank Markham, safety and personnel supervisor for Bird and Son, and others. Markham testified that prior to the accident plaintiff had an excellent work record and was known to be reliable and honest and that, when plaintiff began to miss work on occasions after the accident, he informed Markham that he was having dizziness and blackout spells.
 
 [2]
 

 Plaintiff’s history of episodes of weakness, .dizziness and blackouts after the accident are confirmed by Charles Clark and plaintiff’s wife. Philip O. Johnson, machine foreman at Bird, testified that plaintiff worked under him and that he was a good hand until the date of the accident but after that he worked irregularly due to blackout spells.
 

 The testimony of Drs. Birdwell and Rushing, Bird’s physicians, that plaintiff suffered only superficial first and second degree burns is in direct conflict with that of the two Doctors Sanders, who stated positively that plaintiff also suffered some third degree burns. Dr. Rushing gave preliminary treatment on the date of the accident and says he saw him once more in his office two or three days later. Dr. Birdwell saw plaintiff only once after he left the hospital, two days later, on August S, 1960. On the next occasion, when Dr. Birdwell saw plaintiff at the Bird & Son plant on July 19, 1962, he insisted that plaintiff was malingering.
 
 [3]
 

 The testimony of the treating physicians, Doctors J. P. and J. C. Sanders, is much more impressive than the opinions of Doctors Birdwell and Rushing. The former treated plaintiff from August 6th until September 12, 1960, when he returned to work, as well as in February and June of 1961. Important, too, is the testimony of Dr. Walls and Dr. Russell, who also treated plaintiff during the period following the accident.
 

 From August 6th to September 12, 1960, when the two Doctors Sanders first ad
 
 *1023
 
 ministered to plaintiff, they found that he had rather severe burns on his face and ears, back and chest and on his right arm; that there were some first and second degree burns, which were more or less superficial, but that he also had third degree burns in several areas, particularly on his cars which are now deformed and scarred. Thereafter they saw him on September 14, 1960 and again on February 3, 1961, when he was hospitalized for a kidney infection (pyonephrosis). He was treated at the hospital until February 24, 1961 for this kidney infection. Dr. J. P. Sanders testified that severe burns cause pyelitis, or infection of the kidneys, and he reported this to the insurance company at that time.
 
 [4]
 
 The doctor also found his blood pressure very low. In June of 1961 plaintiff again visited the Sanders clinic complaining of fainting and dizzy spells and, on June 13th, he was found to have a staph-strep infection of both arms and legs which was rather severe; he was anemic and his blood pressure had changed, ranging between 108 and 122. Plaintiff left the hospital on June 17th and was back on June 20th and again on June 29th, complaining of irritated areas over the chest, lungs, legs and arms. Dr. Sanders (as well as the other doctors in his clinic) was of the opinion that plaintiff had suffered damage to the adrenal glands but since he did not have full care of plaintiff after August 6, 1961, he could not be positive. However, he is positive that plaintiff is unable to go back to work for Bird.
 

 Dr. J. C. Sanders testified that an electrical burn and shock or any severe shock could damage the adrenal glands and be a contributing factor to the hypotension and hypotensive state and is probably a definite cause of the syncope that plaintiff has suffered ever since the accident. He further stated that the infection from the burns, which led to the kidney infection for which plaintiff was hospitalized, was the result of the accident and shock emanating therefrom.
 
 [5]
 
 The infection which followed with boils and abscesses, as well as the staph infection of the skin, are also the result of the predisposing cause, the accident of August 3, 1960.
 

 Unlike the district court and the Court of Appeal, we interpret Dr. J. C. Sanders’ testimony to mean that a thermal burn, which causes shock, can damage the adre
 
 *1025
 
 nals as well as an electrical burn and, if this be so, it is immaterial whether the burn, if it caused shock, was a thermal burn or an electrical burn.
 

 During 1961 plaintiff was placed in Garrett’s Hospital in Springhill, Louisiana for pneumonia and hypotension, where he remained for one week under the treatment of Dr. Charles Walls. Dr. Walls was of the opinion, based on the history given by plaintiff of receiving electrical shock and burns in August, 1960, that severe adrenal damage was present and he referred him to Dr. Dan E. Russell, an internist of Shreveport, who hospitalized plaintiff in the Schumpert Hospital on December 6, 1961.
 

 The tests made by Dr. Russell failed to reveal any specific abnormal findings referable to the endocrine system. However, it was found that plaintiff had postural hypo-tension which was aggravated by a change of position. Dr. Russell also found a low blood sugar count. As to causal connection, Dr. Russell testified:
 

 “Not having ever seen him before the accident, I don’t know what his previous health was, but from the account that Mr. Russell gave me and having followed him for a period of time, it seemed that there must be some causal relationship to the accident as he had previously been able to do his work adequately; following he was unable to do so and was having these attacks. I can’t say that they were specifically caused by it because there could have been some functional component to it but it seemed to me that there was a definite relationship.”
 

 Dr. Russell stated that there was at least a contributing causal connection. He testified that his clinical findings of low blood pressure and low blood sugar could stem from damage to the pancreas or damage to the adrenal glands or to the pituitary glands. He was asked the following question on cross-examination:
 

 “Q. Doctor, I want to ask you a question in which I want you to assume that the facts I give you are true. I want you to assume that Mr. Russell did not receive an electrical shock on August 3rd, 1960, but that he was burned at the time of the accident by a
 
 flash burn.
 
 Would that alter your opinion any as to the relationship between this accident of August 3, 1960, and any disability that he may have had while he was being seen by you, regardless of its nature ?
 

 “A. I zvotild think that any type of severe shocking accident, whether it be electrical or whether it be flash burns,
 
 could produce a similar type of reaction in the person involved in the accident, and
 
 *1027
 
 could give him these findings. That would merely be an assumption.
 

 “Q. In other words, it would not make any difference to you whether or not he had received a severe electrical shock or whether he had received severe flash burns ?
 

 “A.
 
 I would think that either could produce the findings in this man that they call shock; put him in shock.
 

 “Q.
 
 When you speak of shock, is that a condition that is easily diagnosed by a physician ?
 

 “A. It is if the physician is present at the time it happens. You can be in and out of shock sometimes before a physician is present to examine you.” (Emphasis ours).
 

 It is seen from the foregoing testimony of Dr. Russell that he is of the view that the type of burns suffered by plaintiff, whether electrical or thermal, is immaterial as long as plaintiff suffered shock as a result of the accident. In view of the circumstance that plaintiff suffered severe burns which became infected and were followed by orthostatic hypotension, we think that this evidence (which is not rebutted) fairly establishes that plaintiff suffered shock. Of importance on this question is the evidence of Dr. Frank T. Dienst, Jr., whose testimony is relied upon by both plaintiff and the defendants.
 

 Dr. Dienst testified that plaintiff had low blood pressure and syncope and, on direct examination, he stated that this was attributable to the burns received in the accident. At that time he was under the impression that these were electrical burns and not thermal bums. On cross-examination, he was asked a hypothetical question as to whether his opinion would be the same if he assumed that plaintiff had received thermal burns of no more severity than second degree and that he did not get an electrical shock. To this question the doctor first answered that he would have to still say that the burns would have causal connection with the subsequent condition which he diagnosed as adrenal damage. He was then asked the question could mere flash burns, unaccompanied by electrical shock, cause adrenal damage. He answered that he doubted this and said that, if plaintiff had a mere flash burn, he could not have developed an adrenal situation.
 

 Counsel for defendants rely upon this testimony as disproving causal connection between the accident and plaintiff’s present condition. However, we do not so view Dr. Dienst’s testimony. The hypothetical question propounded by defense counsel to the doctor was based solely on the diagnosis of Drs. Rushing and Birdwell that plaintiff suffered first and second degree burns only. However, according to the testimony of
 
 *1029
 
 both Doctors Sanders, which we think is highly credible, plaintiff sustained third degree burns as well and, if he sustained third degree burns followed by infection, we think it almost inconceivable that he did not suffer shock. And shock unquestionably (according to Dr. Dienst) is an ideological agent to which adrenal injury can be attributed.
 

 It is true, of course, as stated by the Court of Appeal, that a plaintiff in a compensation case must establish his claim by a preponderance of evidence. But this does not mean that he must prove the exact cause of his disability but only that he demonstrate by a preponderance of proof that the accident he sustained has causal relationship with his disability. See Malone, Louisiana Workmen’s Compensation Law and Practice, Permanent Edition, Sec. 252, «page 300. Here, we believe that plaintiff has shown causal connection between the accident and his disability for, although he thought that his burns were attributable to an electrical origin, the medical evidence, to which we have adverted above, warrants the conclusion that the burns were of sufficient gravity to produce shock and that shock can and will cause hypotension and adrenal damage. Surely, it cannot fairly be said that there is any evidence which successfully contradicts the view of Dr. Russell. For our part, we necessarily attribute considerable weight to the circumstantial evidence showing that plaintiff, an industrious workman for sixteen years, has had an accident following which he has suffered from hypotension, has had dizziness and blackout spells of increasing intensity and, within a period of less than two years, has been rendered unable to perform the duties he had so diligently performed previously.
 

 We note that defendants have filed an exception of prescription of one year to plaintiff’s claim and, although the plea has not been argued or briefed in this Court, we assume that defendants are still relying upon it since they were successful in having the suit dismissed in the courts below on another ground.
 

 We find this plea to be without merit as the case falls within the exception contained in R.S. 23 -.1209 to the effect that, where the injury or disability does not develop immediately after the accident, the one year limitation shall not take effect until the expiration of one year from the time the injury develops, provided that the claim for payment is made within two years from the date of the accident. The facts of the case are somewhat parallel to those in Mottet v. Libbey-Owens-Ford Glass Co., 220 La. 653, 57 So.2d 218; Johnson v. Cabot Carbon Company, 227 La. 941, 81 So.2d 2 and Wallace v. Remington Rand Inc., 229 La. 651, 86 So.2d 522, where pleas of one-year prescription were overruled. In those matters, as here, the workmen returned to their employment after the accident
 
 *1031
 
 and performed their duties for some months under stress until they could no longer continue. It was held that, under such circumstances, the disabling injury does not fully develop until the workman cannot perform his duties and that the prescription provided by R.S. 23:1209 does not commence to run until the discontinuance of employment, so long as suit is filed within two years of the date of the accident.
 

 The plaintiff has sought recovery of penalties and attorney’s fees in this case but, under the circumstances presented, we doubt that there has been an arbitrary withholding of compensation as defendants had reasonable grounds, based on medical opinions, for denying liability and requiring plaintiff to establish his claim.
 

 For the reasons assigned, the judgment of the district court, which was affirmed by the Court of Appeal, is annulled and it is now ordered that there be judgment herein in favor of plaintiff, Clifford Russell, and against Bird & Son, Inc. and Employers Mutual Liability Insurance Company of Wisconsin, in solido, for compensation at the rate of $35.00 per week commencing on July 20, 1962 for the duration of his disability, not exceeding 400 weeks, with interest at the rate of five percent per annum on each past due installment from its due date until paid.
 

 It is further ordered that all accrued amounts with interest from the due date of each installment at the said rate, until paid, be paid in a lump sum and that the fees for the attorney for plaintiff be fixed and approved at a sum equivalent to 20% of the first $5,000 collected under this judgment and 10% of all amounts in excess thereof pursuant to R.S. 23:1141, as amended, said fee to be paid out of the award made to plaintiff.
 

 It is further ordered that this cause be remanded to the district court for the purpose of fixing the amount of the medical expenses incurred by plaintiff for which defendants are liable not to exceed, however, the sum of $2,500.00, as provided by R.S. 23:1203, as amended.
 

 All costs are to be paid by defendants.
 

 [1]
 

 . Other physicians, Doctors Faludi and Boykin, neurologists, and Dr. Gill, an internist, also testified but their opinions shed little or no light on the question for decision — whether plaintiff’s disability is causally connected with the accident.
 

 [2]
 

 . It is sliown from plaintiff’s work record that he only lost two days on his job for the first nine months upon his return to work after the accident. Thereafter, however, he was ill for a ten day period in June, 1961 and subsequently his inability to work became more pronounced throughout the following year when he was compelled, because of his physical condition, to stop working entirely on July 19, 1962.
 

 [3]
 

 . The overwhelming medical and lay testimony refutes this charge of Ur. Bird-well and establishes beyond question that plaintiff has been totally disabled since July 19, 1962.
 

 [4]
 

 . The record is not clear as to the insurance company to whom the report was made. It does show, however, that Bird & Son, Inc. had taken the position that the accident of August 3, 1960 and resulting injuries wore non-occupational and it referrod the claim to the Aetna Casualty Company which had issued a group nonoccupational limited coverage plus hospitalization and medical expense policy to the employees of Bird & Son, Inc. The employees paid one-half of the premiums on this policy and the other one-half was furnished by the Company.
 

 [5]
 

 . In this connection see Lawyers’ Medical Cyclopedia, Vol. 4, section 30.7, page 120, et seq.