MILLER, Judge
(dissenting).
I am unable to agree with the majority that plaintiff failed to prove that she sustained an accident in the course and scope of her employment.
The trial court and the majority discredit plaintiff’s testimony for the reason that she has made a number of inconsistent statements as to when the accident occurred, and as to how long she delayed after her alleged injury before she sought medical attention. It was also discredited because she testified that she preserved the tack and showed it to Dr. Thompson, which was not remembered by Dr. Thompson.[1]
In my opinion, the trial court and the majority has placed too great a burden on an illiterate, 53 year old Negro woman who had “not a day” of schooling and could not converse in English because she spoke only the French language. Prior to working as a domestic she was employed as a field hand. The record amply supports that she was illiterate and as one doctor testified, she is of “dull mentality.” Plaintiff had no prior accidents and no prior claims. She was acknowledged to be a good worker, who always worked when she was called (Tr. 47), not just on Tuesdays. (Tr. 44).
It is worthy of mention that defendant did not present any evidence, excepting medical testimony; that plaintiff’s employer, Mr. Allen Berzas, testified as plaintiff’s witness and was most helpful in establishing plaintiff’s claim.
Because of plaintiff’s serious difficulty in making herself understood,[2] and because *66 of her low mentality, I am not impressed by the conflicts in her testimony. In this connection it must be emphasized that she did not testify until sixteen months after the accident.
In the writer’s opinion, there were errors in the trial court’s evaluation of the testimony presented in written reasons for judgment handed down several years after the trial. Yet, we are here denying workmen’s compensation because this illiterate cannot with consistency state some sixteen months after the accident, when the accident occurred.[3] The manifest error in the conclusions set forth in the trial court’s opinion, are: (1) There was some confusion as to whether plaintiff reported the injury to the doctor. (It is acknowledged that there is confusion as to how long after the accident she reported to the doctor.) (2) There was conflicting evidence with respect to which foot received the initial injury. (3) There was substantial conflict in the testimony of Allen Berzas (the employer) and plaintiff. (4) That neither doctor found evidence of an entrance wound. (The statement is correct, but the circumstances reduce the importance of this testimony.) (5) That because of the unsatisfactory nature of plaintiff’s testimony, as well as its conflict with other testimony plaintiff failed to carry the burden of proving her case by a preponderance of the evidence. These findings by the trial court will be discussed in that order.
There is no confusion in the record on the question of whether plaintiff reported the injury to the doctor. (Tr. 29, 30, 64, 70 and 81) There is confusion as to just when the accident occurred. Plaintiff alleged in her petition that the accident occurred August 27, 1963. At trial she testified that the accident occurred August 23, 1963; that it occurred on a Tuesday;[4] and that it occurred the day before she reported the accident to her employer, Mr. Allen Berzas, which was the same day she saw Dr. Thompson (August 29, 1963— a Thursday). As noted, Dr. Thompson did not speak plaintiff’s language, and he testified that he understood her to say that she stuck the tack in her foot "approximately” two weeks before August 29th. When notified that the insurance carrier was denying coverage, Dr. Thompson referred plaintiff to Charity Hospital. Lafayette Charity Hospital records for September 13, 1963 indicate that plaintiff reported that she “stepped on a tack 2 weeks ago.” (Thus dating the accident as having occurred in the last week of August, 1963.) Dr. Landreneau understood plaintiff to state that she “stepped on a tack” two weeks prior to her examination by Dr. Thompson. However, the record makes it clear that Dr. Landreneau discussed the case with Dr. Thompson, and it is logical to conclude that this part of the history was obtained from Dr. Thompson.
Also relevant to the issue of when the accident occurred is the testimony of the Eunice Country Club manager, Mr. Allen Berzas, who testified (^s hereinabove noted) as a witness for plaintiff. When questioned on direct examination as to what day plaintiff told him that she had stepped on a tack, Berzas answered, “I couldn’t tell you, sir. I don’t remember.”
“Q. The day she called you, had she worked the day before?
“A. I knew she’d worked, yes, sir and I know a few days later when she called back and said she’d stuck a tack in her foot.
“Q. Well, you are not certain then whether or not it was the day after she worked or not, huh?
*67 “A. No, Sir, I couldn’t tell you.” (Tr. 46)
Also relevant to this issue is the fact that plaintiff’s diabetic condition definitely caused the infection in her foot to rapidly deteriorate into the gangrenous condition found by Dr. Thompson on August 29. (See Dr. Thompson’s testimony hereinafter quoted.)
In my opinion, the preponderance of the testimony establishes that plaintiff “stepped on a tack” on the last day of her employment with Eunice Country Club. The fact that this illiterate woman cannot with consistency name a date when this accident occurred is not sufficient to justify a conclusion that the accident did not occur.[5] In this connection, the employer who testified on behalf of plaintiff, was unable to name a day as the last day of her employment. He only knew that it was “a few days later when she called back and said she’d stuck a tack in her foot.” Defendant did not produce evidence on this issue.
The only basis for the trial court’s finding that there was a conflict in the evidence with respect to which foot received the initial injury, is the testimony of Dr. Thompson. The doctor frankly admitted that he may have been in error in his report stating that he treated the right foot. He was only certain that he treated a foot. A review of Dr. Thompson’s entire testimony, together with the Charity Hospital report and Dr. Landreneau’s testimony, makes it absolutely certain that there is no basis for doubt that Dr. Thompson treated the left foot.
Concerning the trial court’s finding of a substantial conflict in the testimony of the employer and employee, the writer finds that Berzas (the employer, called by plaintiff) essentially corroborated plaintiff’s testimony. He verified that there was construction going on; that he had been worried about plaintiff wearing slippers for fear that she might step on a tack. (Tr. 45). Berzas didn’t know how long plaintiff had worked for the Country Club, but it was for a “pretty good while.” “She worked different days of the week, whenever I needed her.” (Tr. 44). He confirmed that plaintiff called to report the accident, but that she told him she stepped on a “thumb tack.” Mr. Berzas testified that plaintiff was a “good worker” and that she was paid $4.00 per day. During the time plaintiff worked for the Country Club, she never complained of any illness or disability. Everytime Mr. Berzas called her, she came to work.
The few differences in Berzas’ testimony and that of plaintiff resulted principally from an adjuster’s statement taken from Berzas a few days after the accident was reported. On cross examination, defense counsel confronted defendant’s manager with the fact that he testified that plaintiff was wearing slippers at work, whereas the statement Berzas had given to the adjuster states that she was wearing shoes. Berzas explained that he didn’t see a great deal of difference between slippers and shoes. It was made abundantly clear that Berzas was certain she had worn slippers the last day that she worked.
Defendant also points to the fact that plaintiff states that she stepped on the tack in the kitchen, while Berzas testified that there would not be any loose tacks on the floor of the kitchen. It appears that plaintiff’s duties were to clean up the premises and to bring trash to the kitchen. It seems reasonable to conclude that some of the many tacks which the undisputed evidence shows were on the floor in different areas of the Country Club, could have been found in the kitchen.
There is a difference in the testimony in that plaintiff says she stepped on an ordi *68 nary tack, whereas Berzas understood her to state she stepped on a “thumb tack.” It would be difficult to find that plaintiff is able to understand the difference between the two. The writer agrees with defendant’s argument that .her testimony that she took the tack to the doctor weakens her case for if the tack was of sufficient interest for her to bring it home and later to the doctor, then it was important enough for her to have immediately reported the incident to her employer. However, the writer is not prepared to hold that this discrepancy in plaintiff’s testimony is such that the court would be justified in concluding that this illiterate plaintiff’s testimony was totally unworthy of belief. The trial judge did not specifically hold that she was unworthy of belief. Applicable here is the law where non-essential inconsistencies exist, stated in Gagliano v. Boh Bros. Construction Co., 44 So.2d 732, 734 (La. App.Orls. 1950):
“It is the settled law, in ordinary cases, that the allegatta and the probata should conform, but by specific provisions imbedded in the Workmen’s Compensation Act the usual rules which govern ordinary cases are relaxed, and the parties are not to be bound by technical rules of evidence or procedure. In all jurisdictions, these statutes .have been said to be paternal in their nature.”
The apparent basis for the trial court’s finding that “neither doctor found evidence of an entrance wound,” is the testimony of Dr. Thompson, for he was the only treating physician during the first two1 weeks. He treated the wound by cutting away a great deal of the dead tissue. It would have been impossible to see the puncture wound after that time. Because of the importance of his testimony on this point, the relevant testimony is quoted. Dr. Thompson (called by defendant) was questioned by counsel for defendant concerning what he found on his first examination of August 29, 1963:[6]
“A. Well, she had a puncture wound of the foot which, according to her, was caused by stepping on a tack.
“Q. How long before did she say she stepped on it?
“A. She told me that at approximately two weeks prior to first visit.
“Q. Now, did she tell you how she hurt her foot?
“A. She -said she was working at the Country Club and stepped on a tack two weeks prior to this, approximately.
“Q. What was the condition of her foot, Dr. Thompson?
“A. Well, she had gangrene of her foot at that time when I saw her.
“Q. How long does it take that condition to develop in a patient such as this who we know has diabetes?
“A. Well, this can be immediate or it can be a good long while; it could be any length of time.”
“Q. What was your estimation as to the time lapsed between the puncture wound and the date of your examination ?
“A. Well, my impression here was she had had this quite a bit longer than two weeks.
******
“Q. What did you prescribe for her and what was the nature of your treatment, Doctor?
“A. Well, I gave her penicillin and tried to bring her diabetes under control and put dressings on the debridement and also put dressings on the lesion.
“Q. Now, at the time you first examined her foot, was it possible for you to see the site of the puncture or was the foot * * *
*69 “A. * * * no, you couldn’t see it.
“Q. In other words, it was in too bad condition ?
“A. That’s right.”
While under cross examination concerning the first visit of August 29, 1963, Dr.. Thompson testified:
“Q. Doctor, did you make a diagnosis at that time, sir?
“A. Just a puncture wound, and I thought she had an area of gangrene then.”
Dr. R. E. Landreneau, General Surgeon of Eunice, Louisiana, testified as a witness for plaintiff. He first saw plaintiff in the emergency room at Moosa Memorial Hospital on September 19, 1963. He found a severe diabetic abscess with gangrenous changes of her left heel. Dr. Landreneau testified that “he could not say definitely that there had been a puncture wound.” * * * “it looked like an infected — it could well have been a puncture wound because it was circular, it was round and it was localized. I assumed that it had this infection and that the subsequent abscess had been caused by a puncture wound. This would have been a natural course of events.” (Tr. 81)
On cross examination by defense counsel, Dr. Landreneau testified:
“Q. Now, you stated that there was an area that was open on her heel when you first saw her and this could have been the site of a puncture wound. Did you know that Dr. Thompson had cut away a portion of the skin to insure drainage while he was treating her?
“A. I got this history from Alice and also from Dr. Thompson, yes. Of course the skin had been removed and he substantiated her history that she had had an initial puncture wound. He also told me. He substantiated her history of a puncture wound in the left heel.
“Q. But you don’t know that for a fact. You don’t know what happened to that heel?
“A. All I know is what Alice told me and what Dr. Thompson told me. He substantiated — he had treated her initially * * * ” (Tr. 91, 92)
While Dr. Thompson did testify that the condition of the wound was too bad to permit him to see the puncture wound, it appears that Dr. Thompson was completely satisfied that he was treating plaintiff for a gangrenous infection that originated with a puncture wound, which was aggravated by plaintiff’s pre-existing diabetic condition. As noted by Dr. Thompson, this condition “can be immediate” or it “could be any length of time.”
Considering the difficulty with which this illiterate French speaking 53 year old Negro plaintiff was confronted in attempting to relate the facts concerning an accident, the writer is unimpressed with the few inconsistencies in her testimony and finds that her version of the accident is supported by the circumstances and she therefore proved the occurrence of an accident. Kirkham v. Consolidated Underwriters Insurance Company, 219 So.2d 827 (La. App.2nd Cir. 1969). See also Johnson v. Calcasieu Paper Co., 95 So.2d 659 (La.App. 1st Cir. 1957).
Is there a causal relationship between the injury to the left foot and the loss of plaintiff’s right leg? The writer finds that there is. The puncture wound to plaintiff’s left heel became infected. Her pre-existing diabetic condition made treatment extremely difficult. The only way that plaintiff’s left leg could be saved was to take skin grafts from her right leg. Excellent medical treatment and care saved her left leg although the medical evidence indicates that her condition was such that good medical practice would have permitted *70 the immediate amputation of her left leg. The infection of the right leg occurred as a result of the skin graft and the right leg was amputated by doctors at Lafayette Charity notwithstanding the urgent plea of Dr. Landreneau that they treat her rather than amputate the leg. The only reason that plaintiff was transferred to Charity was because her hospital bill in Eunice totaled almost $2,500 and the Eunice Hospital was not in a position to allow additional credit. The amputation at Charity was acceptable medical practice because of thé infection, together with pre-existing diabetes which complicated and aggravated the condition. This is true notwithstanding the fact that the condition of plaintiff’s right leg was not nearly so bad as had been plaintiff’s left leg, which was saved. The writer finds a causal relationship between the injury suffered and her present total disability. Russell v. Employers Mutual Liability Insurance Company of Wisconsin, 246 La. 1012. 169 So.2d 82 (1964).
For these reasons, I respectfully dissent.
On Application for Rehearing
Before FRUGÉ, SAVOY, HOOD, CUL-PEPPER AND MILLER, JJ.
Rehearing denied.
FRUGÉ and MILLER, JJ., vote for rehearing.

. On this question, Dr. Thompson testified : “If she did, I didn’t see it. Now, she may have said she did, but I don’t remember seeing it.” (Tr. 75)

. Dr. Thompson always communicated with plaintiff through an interpreter. Charity Hospital records of September 13, 1963 show “tick bite on the heel of left foot.” This was corrected to show that she “stepped on a tack 2 weeks ago.” Note the similarity of the words “tick” and “tack”.

. Any problem with plaintiff’s original statement to Dr. Thompson as to the date of the accident could be due to the language barrier. And it is noted that he emphasized that she said the accident occurred “approximately” two weeks before his first examination. As hereinafter noted, plaintiff’s employer testified that plaintiff reported the accident to him several days after her last day on the job.

. August 23, 1963 was a Friday.

. In Ortego v. Southern Industries Co., 88 So.2d 73 (La.App.1st Cir. 1956), the court held it was not fatal to plaintiff’s cause that it was conclusively shown that no accident occurred on the alleged date. See also Gisevius v. Jackson Brewing Co., 152 So.2d 231 (La.App. 4th Cir. 1963).

. Emphasis in the following quotations added by the writer.