JiDOUCET, Chief Judge.
In this case the administrative hearing officer denied the plaintiffs claim for worker’s compensation benefits based on a finding that there was no causal connection between an on-the-job accident and a stroke subsequently suffered by the claimant. The claimant appeals.
The claimant, Jennell Gers, was employed part-time by the National Tea Company d/b/a the Real Superstore (Superstore) in Lafayette, Louisiana. On July 29, 1992, she struck the crown of her head on a low doorway connecting two warehouses at the store. There was no witness. She told a co-worker, Cynthia Granger, about the accident and Granger felt a knot on Gers’ head. Granger further reported that Gers was feeling ill, took her break early and left work early. There is no evidence that Gers lost consciousness because of the blow. While she was on break she told the co-manager of the store, Murray Childers, about the bump. Childers reported that they joked about it. Childers said that he allowed Gers to leave work at nine p.m., one hour early, because business was slow. He said that she did not say why she wanted to leave early. Gers had previously arranged to pick up a friend, Johnny Keele, at work at nine. She did so, dropped him off at his |2house, and returned to her own house. There she changed clothes to go out. Her two daughters saw her and said that she did not speak to them. As a result, they thought she was in a bad mood or had problems at work. Gers then went to pick up Keele. The two of them went to a bar where they met Gers’ boyfriend, Jimmy LeBlanc. Gers and LeBlanc danced. Gers had several drinks. The two went home at midnight. Keele testified that another friend told him that the two went home because Gers was not feeling well. Keele testified that LeBlanc and Gers normally stayed out until about 2:30 a.m., then would go to breakfast. The next morning Gers woke up with a headache. At about 8:00 a.m. Gers called her father, who testified that he noticed nothing unusual about his daughter or the conversation. At approximately 8:55 a.m. LeBlanc awoke. The two engaged in sexual intercourse. Either during or shortly afterwards, Gers complained of a violent headache. She and LeBlanc went into the bathroom. While he was getting a wet washcloth to put on her head, she fell to the floor unconscious, striking her right eye on the tub. LeBlanc took her to the hospital. A CT scan was run. The doctors concluded that an aneurysm in Gers’ brain had ruptured, resulting in subarachnoid intercere-bral and interventricular hemorrhage. Dr. Jack Hurst, a neurosurgeon, did a ventricu-lostomy, that is, drilled a hole through her skull and inserted a drain, to relieve pressure on the brain. On August 7, 1992, Dr. Hurst again operated on Gers during which he clipped the ruptured aneurysm at its neck to reduce the risk of another rupture.
The Superstore refused to pay worker’s compensation benefits. Gers brought this claim. A hearing was held on March 8-10, 1994. The medical evidence was in conflict. Dr. Hurst testified by way of deposition that the bump on the head put into motion a chain of events that ultimately resulted in the rupture of the aneurysm. Three other experts in the field of neurology and neurosurgery testified for the defendant that the blow received by Gers could not have caused the aneurysm to rupture. The hearing officer appointed her own expert, Dr. Thomas Ber-tuccini, to review the evidence. Dr. Bertuc-cinni agreed that the bump on Gers’ head played no role in the subsequent rupturing of the aneurysm. After considering all the evidence and the report of Dr. Bertuccini, the hearing officer denied Gers’ claim. The hearing officer found that Gers had not sustained her burden of proving |3a causal connection between the work-related accident and the disability. The hearing officer, however, did award attorney’s fees of $5000 to Gers based on the defendant’s failure to provide witness statements, medical records, the *779 claimant’s personnel records and wage and earning statements and photos of the accident scene when requested by claimant’s attorney or in a timely fashion. Gers appeals. The Superstore answered the appeal questioning the award of penalties and attorney’s fees, and the failure of the hearing officer to award penalties and attorney’s fees to the Superstore for Gers’ failure to respond timely and adequately to the discovery requests of the Superstore. We will not consider whether penalties and attorney’s fees should have been awarded to the Superstore because the Superstore failed to argue this issue in brief.

CAUSAL CONNECTION

Gers contends that the hearing officer erred in finding that she failed to carry her burden of proving a causal connection between the work-related accident and the subsequent disability.
“In a worker’s compensation case, the plaintiff/injured employee bears the initial ‘burden of establishing the causal connection between the disability and the employment accident by a reasonable preponderance of the evidence.’ Hammond v. Fidelity & Cas. Co. of N.Y., 419 So.2d 829, 831 (La.1982); Prim v. City of Shreveport, 297 So.2d 421, 422 (La.1974). It is not necessary for the plaintiff to establish the exact cause of the disability, or, in this case, the death, but it is necessary for the plaintiff to ‘demonstrate by a preponderance of proof that the accident [that was] sustained has [a] causal relationship with [the] disability.’ Russell v. Employer’s [Employers ] Mutual Liability Insurance Co. of Wisconsin, 246 La. 1012, 169 So.2d 82, 88 (La.1964). This causal relationship can be demonstrated, creating a presumption that the accident caused the disability, when an employee proves that
. before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves after-wards, providing that there is sufficient medical evidence to show there to be a reasonable possibility of causal connection between the accident and the disabling condition.
Walton v. Normandy Village Homes Association, Inc., 475 So.2d 320, 324 (La.1985). The establishment of this causal relationship serves to create a legal presumption that the injury caused the disability. Id. After an employee successfully 14‘establishes the presumption of a causal relationship, the party denying the existence of a presumed fact assumes both the burden of producing evidence and the burden of persuasion on the issue.’ Id., at 325. This presumption is not rebutted by the mere introduction of contrary testimony, as rebuttal in this instance requires more:
The effect of the presumption is not so slight and evanescent that it is spent and disappears upon the mere production of evidence by the adversary. It is a true presumption that has been created for policy reasons that are similar to and just as strong as those that underlie the compensation principle itself....
Id.”
Quinones v. U.S. Fidelity and Guar. Co., 93-1648 (La. 1/14/94), 630 So.2d 1303, 1306-1307. (Emphasis added.)
The evidence suggests that before the accident Gers may have had what are known, as sentinel headaches, which sometimes signal an oncoming stroke. However, the aneurysm ruptured, with resulting disability, approximately 15 hours after she hit her head at the Superstore. The question we must consider is whether the claimant presented sufficient medical evidence to show there was a reasonable possibility of causal connection between the accident and the disabling condition.
Dr. Jack Hurst, a board eligible neurosurgeon, was Gers’ treating physician. He testified by way of deposition. He stated that it was in the realm of possibility that the blow to the head the previous evening put into motion certain mechanisms that eventually led to the rupture of the aneurysm. He said that, even having seen the aneurysm site during surgery, it was impossible to state to *780 a certainty what caused the rupture. He conceded that sexual intercourse is a well-known precipitating factor in the rupture of aneurysms. He testified that his opinion in this was formed by his review of the CT scan and observations during the surgery to repair the aneurysm. However, he testified that during that surgery he was only interested in repairing the aneurysm and was not looking for the cause of the aneurysm. He stated that the CT scan showed a hematoma in the temporal lobe of Gers’ brain three centimeters away from the site of the aneurysm. During the operation to repair the aneurysm he found no connecting tract between the aneurysm and the hematoma. He said that the blood shooting out of the aneurysm would have left such a tract if it caused _[5&e hematoma in the temporal lobe. While the dome of the aneurysm was “densely adhesed into the medial surface of the temporal lobe,” he felt that the tract was not hidden by the adhesions because he did not see a corona of bruising which would occur around such a tract. However, he admitted that the fact that he did not see the connection did not mean that none existed. Given the absence of a connection between the aneurysm and the temporal lobe hematoma, he felt that the blow to the head caused the temporal lobe hematoma to slowly develop during the night. He felt that the temporal lobe hematoma occurred before the rupture of the aneurysm because the blood in the upper cuts of the CT scan appeared to be darker, indicating older blood. Although he opined that the increasing intracranial pressure caused by the temporal lobe hematoma somehow was a causal factor in the rupture of the aneurysm, he could not explain the physiological means by which this might occur. He felt, however, that it was reasonably possible that the blow to the head was the cause of the ruptured aneurysm.
By way of rebuttal, the defendant presented the testimony of three experts in the field of neurology and neurosurgery. None of the three felt that the blow to the head had anything to do with the aneurysm. Dr. Richard Levy, a board certified neurosurgeon, felt that the three-centimeter gap between the site of the aneurysm and the temporal lobe hematoma did not really exist. He explained that the slice of the brain shown on the CT scan film used by Dr. Hurst did show a gap, but that films showing lower slices of the brain showed no gap. Further, he felt that if the blows to the head of the type received by Gers might cause concussion and even bleeding between the skull and the brain, it would not cause bleeding inside the brain. He stated that temporal lobe contusions cannot be caused by less than moderately severe head injuries. He said that such injuries are not sustained without unconsciousness. Dr. Levy testified that congenital aneurysms of the type that Gers had virtually never rupture as the result of trauma. Further, he knows of no scenario in which blood in the temporal lobe would cause an aneurysm to burst. He stated that there was no reasonable medical possibility that the blow to Gers’ head caused the aneurysm to burst.
ItiDr. Donald Adams, a board certified neurologist, also testified. He said that the medical literature does not mention minor trauma as causing aneurysms to rupture. Since approximately 30,000 aneurysms rupture each year, he believed that a connection between minor head injuries and aneurysms rupturing would have been noted previously. He negated the idea that the blow could have set off a chain of events that led to the rupture. He said that there is no mechanism, theoretical or otherwise, to connect the blow to Gers’ head and the subsequent rupture of the aneurysm. However, he stated that the physiological changes that go on during sexual intercourse are a well-known precipitating factor in the rupture of aneurysms. He felt that the distance between the hematoma and the aneurysm, if any, was not significant. He agreed with Dr. Levy that the distance noted was a result of the way the CT scan sliced the brain and that the gap was not present on other cuts of the scan. Dr. Adams said that a blow to the head sufficient to cause a hematoma inside the brain would cause a loss of consciousness and major changes in personality and ability to function. These functional problems would include focal neurological deficits, weakness on one side, confusion and terrible headaches. He testified that bleeding inside *781 the brain is rare even in cases of severe head injury. He explained that to rupture vessels deep within the brain takes terrific shock or a penetrating wound. According to Dr. Adams’, an aneurysm caused by that kind of severe trauma would be different in physical appearance from the kind of congenital aneurysm found in Gers. He stated that a blow such as that received by Gers may cause bleeding on the surface of the brain but not inside. He felt that the aneurysm was more likely to have burst for no reason than because of the blow to the head. He testified that temporal lobe hemorrhages are rare in the absence of a ruptured aneurysm. He stated when the aneurysm ruptured the blood would have shot out of the rupture, into the temporal lobe and through into the ventricular system, where Gers was also found to have blood. Blood from the aneurysm had to pass through the temporal lobe and into the ventricular system for blood to be found there in such large quantities.
Dr. Adams further opined that for Dr. Hurst to be sure that no tract existed through which the blood entered the temporal lobe, he would have had to look where the dome ofj7the aneurysm was adhesed to the temporal lobe. This could not be done without a high risk of re-opening the aneurysm. Dr. Adams further opined that the age of the blood could not be discerned from the CT scan. He explained that the blood at the bottom of the scan would appear lighter than that at the top because it would be mixed with brain tissue. Further, he explained that blood takes four or five days to decompose. To have become darker, the blood at top of the CT scan would have had to be four or five days old. Since the CT scan was taken the day of Gers’ collapse, four or five day old blood could not have resulted from the blow to the head which occurred just the night before.
The testimony of Dr. John Shumacher, a board certified neurosurgeon, is consistent with that of Drs. Adams and Levy. He stated that it would take a massive trauma to cause intracerebral hemorrhage. Such trauma would render the victim unconscious. Further, he said that it is common for posterior communicating aneurysms to bleed into the temporal lobe.
Gers argues that the hearing officer failed to give appropriate weight to the testimony of the treating physician. This argument fails to allow for the fact that the hearing officer appointed an expert for the court. “The opinion of a court-appointed expert is entitled to significant weight since that expert is a disinterested party and should therefore have entirely objective conclusions. Green v. Louisiana Coca Cola Bottling Co., Ltd., 477 So.2d 904 (La.App. 4th Cir.), writ denied, 478 So.2d 910 (La.1985).” Vidrine v. Magnolia Liquor Co., Inc., 533 So.2d 1329, 1333-1334 (La.App. 3 Cir.1988). See also Jackson v. D.C. Kile, Inc., 614 So.2d 225 (La.App. 3 Cir.), writ denied, 616 So.2d 702 (La.1993).
In a report dated June 13, 1994, Dr. Ber-tueeini wrote that:
“The degree of injury incurred by intracra-nial arterial blood vessels must be considerable in order to result in aneurysmal formation. Additionally, these weakened focal areas of blood vessels usually take considerable time before an aneurysm develops (most often weeks to months). There is no evidence, based on the facts available to me, to support the notion that this minor injury at the vertex of her head could result in aneurysmal formation of an arterial blood vessel near the base of the brain.”
In his report to the hearing officer dated July 6, 1994 said that:
| ⅜ “After having studied the pertinent history and medical literature, I found it extremely unlikely that the mild blow to the patient’s head was of consequence relative to her subsequent subarachnoid hemorrhage. Therefore, I did not address this factor in combination with the subsequent coital event and their relationship to the subarachnoid hemorrhage.
It is common to see patients with sub-arachnoid hemorrhage that have occurred during or shortly after sexual intercourse. This results from significant increased blood pressure which, acting on a weakened blood vessel aneurysmal wall, results in subarachnoid hemorrhage.
*782 Based on these factors, my opinion regarding the cause of subarachnoid hemorrhage in this patient remains unchanged from previously.” (Emphasis added.)
The hearing officer committed no error in placing a heavier emphasis on the unbiased findings of the court appointed physician in her determination that the claimant failed to show a causal connection between the work-related accident and her subsequent disability. The evidence as a whole, particularly in light of the treating physician’s inability to testify with certainty on the cause of the stroke, furnishes a reasonable basis for the conclusion that there was no causal connection between the blow to Gers’ head and the rupture of the aneurysm.

PENALTIES AND ATTORNEY’S FEES

Gers further argues the hearing officer awarded an inadequate attorney’s fee because she failed to award an attorney’s fee under La.R.S. 23:1201.2 for arbitrary and capricious failure to pay benefits. However, since we have found that no causal connection existed between the injury and the subsequent disability, we cannot say that the defendant was arbitrary and capricious in failing to pay benefits.
In its answer to the appeal the Superstore argues that no award of penalties should have been assessed against it. The hearing officer stated in the reasons for judgment that:
“The parties stipulated that the employer failed to provide to claimant’s attorney witness statements, medical records, the claimant’s personnel records and wage and earning statements and photos of the accident scene when requested by claimant’s attorney or in a timely fashion. The employer’s refusal to provide the requested information was arbitrary, capricious and without reasonable cause. It was also vio-lative of the Act which requires that records be provided to the claimant, when requested and within a certain period of time. Therefore, attorney fees were awarded to claimant’s attorney for the prosecution of this claim.”
19La.R.S. 23:1125 provides for penalties for failure to provide a medical report of an examination requested by the employer, as follows:
“Whenever an employee, whether injured or not, shall at the request of the employer submit to any type of medical examination and a medical report is received by said employer, such employee, or his representatives, shall be entitled to a copy of the written report of the results of said examination within thirty days from the date of written demand upon the employer for such report. Such written report shall be furnished to said employee, or his representatives at no cost to the employee and shall be in "writing and signed by the professional medical or paramedical examiner performing such examination. Any employer who without just cause fails to furnish such report to an employee so requesting same within the thirty day period provided above shall be liable to the employee for a civil penalty in the amount of $250.00, plus a reasonable attorney’s fee for the collection of such penalty.” (Emphasis added)
We find no other authority in the worker’s compensation statute for the assessment of attorney’s fees for failure to comply with discovery requests. La.Civ.Code art. 9 provides that:
‘When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature.”
The language of La.R.S. 23:1125 clearly limits the assessment of penalties to situations where an employee is examined by a doctor at the request of the employer. Further, we find no jurisprudence which interprets this statute as extending beyond such situations. Therefore, this provision does not extend to the discovery of the records of experts who may have reviewed the employees medical records or to the discovery of any other information. It is the job of the legislature, not this court, to extend this provision to cases where only the employee’s medical records are reviewed.
Of the doctors who testified as experts for the Superstore, only Dr. Adams examined *783 the claimant at the request of the Superstore. Therefore, attorney’s fees may be awarded only if the Superstore failed to provide Ms. Gers a copy of his report within 30 days of a request therefor. The timetable provided by plaintiffs counsel in brief indicates that the plaintiffs father requested this information on October 7, 1992. Additionally, it indicates that plaintiffs counsel requested the report on October 13, 1992 and that the report was lipreceived on October 29, 1992. Therefore, the plaintiff is not entitled to attorney’s fees under La.R.S. 23:1125.
The Code of Civil Procedure provides for the assessment of attorney’s fees in article 1469 where a party has obtained a motion to compel discovery, as follows:
“(4) If the motion is granted, the court shall, after opportunity for hearing, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney’s fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.”
Our review of the record does not reveal such a judgment or order compelling discovery.
Accordingly, the judgment rendered by the hearing officer is affirmed as to liability. However, the hearing officer’s award of attorney’s fees for failure to timely respond to discovery requests is reversed. Costs are to be paid by the claimant.
AFFIRMED IN PART; REVERSED IN PART.
SAUNDERS, J., dissents and assigns reasons.
THIBODEAUX, J., dissents for reasons assigned by SAUNDERS, J.