802 So.2d 9 (2001)
Leslie BALTHAZAR
v.
GUILLORY RACING FARMS.
No. 00-00941-WCA.
Court of Appeal of Louisiana, Third Circuit.
March 7, 2001.
*11 W. Jay Luneau, Alexandria, LA, Counsel for Plaintiff-Appellee Leslie Balthazar.
George C. Gaiennie, III, Gist Methvin, A Professional Law Corporation, Alexandria, LA, Counsel for Defendant-Appellant.
Court Composed of COOKS, SAUNDERS, and WOODARD, Judges.
SAUNDERS, Judge.
Leslie Balthazar worked for Carl Guillory as a horse trainer. On June 21, 1995, Mr. Balthazar was thrown by one of the horses he was training. As a consequence of this accident, which occurred during the course and scope of his employment, Mr. Balthazar was injured.
Mr. Balthazar filed a claim with the Office of Workers' Compensation (OWC) against Guillory Racing Farm (Guillory Farm) and National Safety Consultants (NSC), Mr. Guillory's insurance company. In his claim, Mr. Balthazar alleged that the Defendants had failed to consider the fringe benefits Mr. Guillory provided to him as a consequence of the master-servant relationship in computing his average weekly wage.
The workers' compensation judge rendered judgment in favor of Mr. Balthazar, and ruled that he was entitled to statutory penalties and attorney fees. From this judgment, Guillory Farm and NSC appeal.

FACTS
Leslie Balthazar (Plaintiff) worked for Carl Guillory (employer) as a horse trainer and was injured in an accident arising out of and in the course and scope of his employment when he was thrown by a horse on June 21, 1995.
Plaintiff filed a claim with OWC naming Guillory Farm and NSC as Defendants, together hereinafter "Defendants". Plaintiff alleged that the Defendants had failed to consider the fringe benefits that the employer provided to Plaintiff as a consequence of the master-servant relationship in calculating his average weekly wage.
The workers' compensation judge rendered judgment in favor of Plaintiff, finding that the Defendants had failed to consider the fringe benefits that the employer provided to the Plaintiff. Further, the workers' compensation judge ruled that Plaintiff was entitled to statutory penalties and attorney fees.
At the time of the accident, the employer paid Plaintiff a salary of $250.00 per week. The employer also provided fringe benefits to Plaintiff. These fringe benefits consisted of a house for Plaintiff and his family to live in, payment of the house phone bill, payment of the utilities, a pickup truck, his fuel expenses, house and automobile insurance, and 25% of the winnings on the horses trained by Plaintiff. Plaintiff and employer agreed to all of *12 these fringe benefits at the beginning of the master-servant relationship. Plaintiff testified that employer indicated to him that the total value of these benefits plus the wages was at least $2,000.00 per month. Based on the testimony and evidence presented by the Plaintiff, the workers' compensation judge concluded that the value of the house furnished by the employer to Plaintiff was $500.00 per month, that the value of utilities furnished to Plaintiff was $300.00 per month, that the value of the vehicle and fuel furnished to Plaintiff was $300.00 per month, and that the value of Plaintiffs telephone bill was $50.00 per month. The total amount of the wages and benefits, according to the hearing officer, was $2,123.33 per month, and that amount divided by four resulted in an average weekly wage of $530.00. The workers' compensation judge awarded Plaintiff a compensation rate of $323.00 per week. He subjected this amount to a credit of $244.19 per week, which was compensation that the Defendants were already paying to Plaintiff. The workers' compensation judge also awarded statutory penalties of $2,000.00 and attorney fees of $4,000.00.

LAW AND ANALYSIS.
I. STANDARD OF REVIEW
[1-3] Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. Smith v. Louisiana Dep't of Corrections, 93-1305, p. 4 (La.2/28/94), 633 So.2d 129, 132; Freeman v. Poulan/Weed Eater, 93-1530, pp. 4-5 (La.1/14/94), 630 So.2d 733, 737-38. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Freeman, 93-1530 at p. 5,630 So.2d at 737-38; Stobart v. State, 617 So.2d 880, 882 (La.1993); Mart v. Hill, 505 So.2d 1120, 1127 (La. 1987). Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 882. Thus, "if the [factfinder's] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La.1990).
Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840, p. 7-8 (La.7/1/97); 696 So.2d 551, 556.

II. DEFENDANT'S ASSIGNMENTS OF ERROR.

1. The finding that Plaintiff had an average weekly of $533.83 is not supported by the evidence, and therefore, the award of weekly benefits of $323.00 was an error.
Defendants assert that Plaintiff failed to carry the burden of proving the value of the fringe benefits he received from the employer. Defendants assert that expert testimony was required for the workers' compensation judge to be able to calculate the value of the fringe benefits. The question to be addressed in this case wherein no expert testimony was presented to prove the value of the fringe benefits, is whether the trier of fact based upon common knowledge, can infer these values from the testimony and evidence presented by the Plaintiff.
Generally, expert testimony, while not limited to matters of science, art, or skill, cannot invade the field of common knowledge, experience and education of men. 3. Am.Jur.2d, Expert and Opinion *13 Evidence, § 21; 100 A.L.R.2d 1421, 92 A.L.R. 1223. An expert qualified as such by her knowledge, skill, experience, training, or education may testify in the form of an opinion. La.Code Evid. arts. 403, 702. An expert's opinion must be based on her scientific, technical, or other specialized knowledge and will assist the trier of fact to understand the evidence or to determine a fact in issue, where it involves matters that the average layman cannot be expected to infer from common knowledge and ordinary experience. State v. Foret, 628 So.2d 1116 (La.1993).
La.R.S. 23:1317(A) mandates that the hearing officer's factual findings be based on "competent evidence." This legislative mandate is required because under the express language of La.R.S. 23:1317, worker's compensation hearing officers are "not bound by the technical rules of evidence." Id. In other words, the workers' compensation judge has the discretion to determine the admissibility of the evidence in a worker's compensation proceeding. When a reviewing court evaluates the factual findings of a workers' compensation judge under the manifest error standard, it must determine whether the factual findings are reasonable and supported by competent evidence in the record. If the factual findings are reasonably supported by competent evidence, the reviewing court must affirm them.
The workers' compensation judge has the discretion to determine if the evidence, testimonial or otherwise, in a worker's compensation proceedings is sufficient to make a determination of the value of the fringe benefits received by the employee. In the instant case, there is sufficient testimony and evidence to substantiate the hearing officer's valuation of the rental value of the house and other fringe benefits. We do not believe that there is a need for an expert to testify about the value of the fringe benefits that Plaintiff received from the employer.
The employer paid the employee the amount of $250.00 per week plus several fringe benefits. The employee testified about his salary:
Q. In the beginning when you first went to work for him in November 1990, in money what was he paying you?
A. [S]tarting me off [sic]at two hundred.
Q. Two hundred dollars how often?
A. A week.
Q. [A]t the time you were injured in June of 1995 how much per week was Employer paying you in money?
A. Two fifty per week.
Q. [W]hen you first went to work for Mr. Guillory and you all discussed what your salary was going to be and what benefits he was going to give you. Did Mr. Guillory ever indicate what he thought these were worth?
A. At least two thousand dollars.
Mrs. Balthazar, Plaintiffs wife also testified about her husband's salary and benefits:
Q. What was your understanding of what [Plaintiffs] benefits and the salary were?
A. When we agreed to work there and Carl offered him two hundred dollars a week plus twenty-five percent of the purse money, andI mean, I argued that a little bit....
As stated before, the fringe benefits consisted of a house for the employee and his family to live in, payment of the utilities, a pick-up truck to use for business and personal purposes, his fuel expenses, the house and automobile insurance, the house phone bill and 25% of the winnings on the horses Plaintiff trained.
*14 At trial, Plaintiff provided photographs and testimony about the house that the employer had provided for him and his family to live in
Q. [A]nd what other salary or benefits did [the employer] offered [sic] you, if any?
A. He gave me a house to live in.
Q. Plaintiff, I'm going to show you some photographs that for identification purposes I'm going to label Plaintiffs exhibit one in globo, and ask you to look at these photographs and tell me what they depict. [W]hat's in this photographs?
A. This is the living room right here next to the fireplace. [W]ith an [sic]stone background and all that.... [T]his is in the same room with the fireplace right here. [T]his is a kind of like [sic] a little get together we had [on] the yard. [T]his is kind of on the side of the house like [sic]. [T]his is the dining room right here. [A]nd ... [T]hat's in the kitchen area.
Q. Plaintiff, how many bedrooms where [sic] in the house?
A. Four.
Q. And how many bathrooms?
A. Two and a half.
Q. Let's compare the size of this room to as what I would CALL large, Plaintiff. How would you compare the bedroom size compared to his room we're in today?
A. One bedroom was this large, sir.
Q. Okay. How about the other three?
A. The other three was [sic] about a fourteen by fourteen I would say.
Q. [A]nd I think the photographs also indicate that it had a fenced-in yard with a white rail fence?
A. [I]t's along the backside that separates the pasture, you know from the yard of the house.
During Mrs. Balthazar's testimony, she also provided a description of the house where she used to lived with her husband, and she recognized the pictures of it that had been filed on the record:
Q. [T]hese are the photographs that your husband testified are the house you all lived in, is that ...
A. Yes, sir.
Q. [C]an you tell me and describe how large the living room was? If you want to you can compare it to this room we're in
A. It was larger than this room.
Q. Okay. What about the kitchen and dining room area, compare it to this room as well.
A. The kitchen was adjacent to the living room and it had a half division where you could see into the living room, and then the bar extendedthe kitchen was very large, the bar went all the way across, the stove was in that bar and we also ate at that bar.
Q. Would you agree with [Plaintiff] physical description of the size of the rooms?
A. Yeah. There was one very large room and then the rest were maybe three quarters of this room.
Q. Okay. Was it a nice house?
A. It was very nice. It was very nice.
Q. Nice yard?
A. Nice.
Thereafter, Plaintiff addressed the fact that the employer also paid the utilities and phone bills:
Q. Who paid the utilities in this house, sir?
A. Employer.
Q. And can you tell me how much the utilities ran in the house?

*15 A. Somewhere in the neighborhood from at least three hundred dollars. [S]ometimes more.... [I]t was total electricity.
Q. [W]hat about the insurance on the house, who paid that?
A. Carl [Employer] did.
Q. [W]ho paid for the phone?
A. Employer.... [The] telephone ran pretty high because I was calling different people about the horses.... [The basic phone service was] about fifty dollars.
Q. [I]n fact I believe you paid for your personal long distance.
A. Right.
As part of the fringe benefits, employer provided Plaintiff with an automobile, fuel, and insurance coverage. Plaintiff was allowed to use the automobile for business and personal purposes.
Q. Tell the Court what elsewhat else you got from Mr. Guillory?
A. Well, I had a 90' three quarter ton Dodge diesel.
Q. That was a pickup?
A. Yes, sir.
Q. [W]hat about the fuel of the truck, who paid for that?
A. Mr. Guillory.
Q. Do you have any idea what the cost was on the fuel?
A. No. It varies sometimes.... I would said approximately two hundred dollars a month....
Q. You obviously didn't use the truck all of the time for business or personal, if we had to divide the two into percentages could you give us some percentage of the amount of personal use you had in the truck?
A. [M]aybe twenty percent or something like that, you know. I mean, eighty percent of it was just business.
Plaintiff also testified that the employer paid for the insurance coverage of the house and the automobile.
Q. All right. What kind ofwas there any coverage on the contents in the house on the insurance, on the furniture and stuff that you had in the house?
A. Yes.... [M]r. Guillory paid that.
Q. [W]hat about the insurance on the truck, who paid for that?
A. Employer.
Q. [I]n addition to these benefits I think you have some kind of arrangement with Employer where he paid you a percentage of winnings on the horses, is that correct?
A. Yes, sir. [W]hen he hired me, you know, he told me what he would give me and everything, and he just said he would give me twenty-five percent of what we made with the horses, you know.
In the present case, the workers' compensation judge acted within his discretion when he determined the weight to be afforded to the evidence presented by Plaintiff to demonstrate the value of these benefits. The workers' compensation judge evaluated the evidence to make the determination of the rental value of the house and other fringe benefits:
Some of the [fringe benefits] values are readily determinable such as his wages, he testified that he received two hundred and fifty dollars a week at the time of his accident, which amounts to roughly a thousand dollars a month. Some of the more difficult determinations of value have to do with the house, utilities, the automobile, various insurance, phone and winnings, [but] after hearing the testimony and reviewing the evidence....
The workers' compensation judge concluded that the value of the house furnished *16 by the employer to Plaintiff was $500.00 per month, the value of utilities was $300.00 per month, the value of the vehicle and fuel was $300.00 per month and the value of the phone bill was $50.00 per month. Thus, according to these values, the workers' compensation judge concluded the total amount of the wages and benefits was $2,123.33 per month. This court notes that this substantially the same amount that the employer indicated to Plaintiff his wages and fringe benefits were worth when they agreed on the master-servant relationship.
The workers' compensation judge divided this amount by four and resulted in an average weekly wage of $530.00. The workers' compensation judge awarded the maximum compensation rate of $323.00 per week subject to a credit for $244.19 per week, which Plaintiff was receiving as average weekly wages.
As stated, all fringe benefits that the employer provided to Plaintiff as part of the master-servant relationship were ordinary living expenses. In the present case, this court finds that from the testimony and evidence presented, the workers' compensation judge was able to determine from his own knowledge, the value of Plaintiff's ordinary living expenses. This court also finds that it was within the discretion of the workers' compensation judge to determine if the fringe benefits claimed by Plaintiff were of the kind that the trier of fact needed an expert to quantify for its calculation. Therefore, we find that the workers' compensation judge acted within the limits of his discretion in evaluating the evidence presented awarding the amount of $323.00 per week subject to a credit for $244.19 per week.

2. The award of statutory penalties and attorney fees is not supported by the evidence.
Defendant also contests the award of penalties and attorney fees. Plaintiff answered this appeal and requested in his brief an increase in penalties and attorney fees. The workers' compensation judge granted to Plaintiff a penalty of $2,000.00 which is the maximum allowed by statute, and attorney fees for the amount of $4,000.00.
In reviewing the award for statutory penalties in this matter, we recognize that a worker's compensation judge is given great discretion in determining what penalties are due. Miller v. Byles Welding & Tractor Co., 96-164 (La.App. 3 Cir. 6/5/96); 676 So.2d 665. This discretion is not to be overturned unless it is clearly wrong. Id. The workers' compensation judge is afforded great discretion in deciding whether to award statutory penalties and attorney fees and her decision will not be disturbed absent a showing of abuse of discretion or that the decision is clearly wrong. Alleman v. Fruit of The Loom-Crowley, 96-1246 (La.App. 3 Cir. 3/5/97), 692 So.2d 485.
In this matter, the workers' compensation judge awarded both penalties and attorney fees. In setting the award for penalties, the workers' compensation judge stated:
In considering the amount of penalties, it was clear to the Court that ... no one at the insurance company made any effort to nail down the exact figures other than apparently some discussion which was held with the now deceased Mr. Guillory.... Mr. Guillory himself [told] both Mr. and Mrs. Balthazar that the total benefits package, and that included what he was paying him in salary plus his rent, utilities and various other fringe benefits, amounted to about $2,000.00 per month.... Based on that and the fact that no further inquiry was performed by the insurance company, I *17 find that a penalty in the amount of $2,000.00, which is the maximum allowed by statute, is warranted.
In setting the award of attorney fees, the workers' compensation judge stated:
"I believe Mr. Laneau did state in his closing arguments that he did in fact had to do the investigation, file [sic]a 1008, participated in the various status conferences, pre-trial conferences with the Court propounded discovery and also sent demand letters to the insurance company, as well as preparing for attending to trial."
An employer who fails to investigate a Plaintiff's compensation claim subjects itself to statutory penalties and attorney fees. Nelson v. Roadway Exp., Inc., 588 So.2d 350, 355 (La.1991); Cochennic v. Dillard's Dept. Store Warehouse, 95-705 (La.App. 5 Cir. 1/17/96), 668 So.2d 1161. This is because an insurer is required to make a reasonable effort to ascertain a Plaintiffs exact medical condition before benefits are terminated. Nelson, 588 So.2d 350; Orgeron v. Tri-State Road Boring, Inc., 434 So.2d 65 (La.1983); Cochennic, 668 So.2d 1161. This obligation is continuing in nature. A worker's compensation plaintiff is not entitled to penalties and attorney fees unless the withholding of benefits is found to be arbitrary, capricious or without probable cause. Withers v. Timber Products, Inc., 574 So.2d 1291 (La.App. 3 Cir.1991), writ denied 580 So.2d 378.

a. Penalties.
According to the record, on October 28, 1998, Plaintiff wrote a letter to NSC in which Plaintiff stipulated his wages and fringe benefits. In this letter, Plaintiff requested that NSC describe the basis upon which the company had established Plaintiff's weekly average in the amount of $244.90, taking into account the fringe benefits he received along with his wages.
The only step taken by the insurance company, was to obtain a recorded statement from Plaintiff, where Plaintiff actually stated he received wages of $250.00 plus fringe benefits. Following this event, NSC did not take any further steps to determine the value of the fringe benefits, notwithstanding Plaintiff's request to do so.
Accordingly, we find that the Defendants failed to properly investigate Plaintiffs compensation claim and were arbitrary and capricious in handling this worker's compensation claim. Therefore, we find that the workers' compensation judge did not err in awarding penalties.

b. Attorney fees.
Adequate attorney fees in workers' compensation cases are the basis for an injured Plaintiff to be able to obtain effective counsel. La.R.S. 23:1221, which authorizes attorney fees, encourages the retention of effective counsel by a Plaintiff who is injured, unemployed and unable to pay for capable representation.
It is evident that an Plaintiff in workers' compensation cases by definition is placed in a disadvantageous position. The Plaintiff is injured, unemployed and often totally lacking in financial resources. In contrast, the employer has the financial means to obtain attorneys to prepare and argue its case. The primary purpose of workers' compensation is to protect injured Plaintiffs from impoverishment. If a Plaintiff is arbitrarily deprived of benefits, the attorney who litigates on his behalf and is successful at showing arbitrary and capricious conduct on the part of the employer, has aided not only his client but also the administration of the workers' compensation *18 system. This work is very important as it helps discourage others who might seek to further their own economic fortune at the expense of persons injured in their employ. Considering these goals of workers' compensation, we find that an increase in attorney[ ]fees is warranted.
Jones v. Universal Fabricators, 00-742 (La.5/12/00); 762 So.2d 13. Therefore, we find that the workers' compensation judge did not err in awarding penalties.

III. Increase of Attorney fees
Plaintiff, in his answer to the appeal, sought an increase in attorney fees. We conclude that Plaintiff is entitled to a $1,000.00 increase in attorney fees attributable to the employer's appeal. According to Naquin v. Uniroyal, Inc., 405 So.2d 525 (La.1981), the factors used in determining attorney fees in workers' compensation cases are the degree of skill and ability exercised, the amount of the claim and the amount of time devoted to the case. Therefore, Plaintiff is entitled to additional attorney fees in connection with the brief filed on appeal. Aguillard v. Industrial Const. Co., Inc., 542 So.2d 774 (La.App. 3 Cir.1989). For the work done on appeal, this court increases the award of attorney fees to $5,000.00.

CONCLUSION AND DECREE
We find that the workers' compensation judge did not err in awarding the amount of $323.00 per week subject to a credit for $244.19 per week. This court also finds that the workers' compensation judge did not err in awarding penalties and attorney fees to the Plaintiff. This court increases the award of attorney fees to the amount of $5,000.00 for the work the Plaintiff's counsel did on appeal. All costs are assessed against the Defendants.
AFFIRMED AS AMENDED.
WOODARD, J., dissents and assigns written reasons.
Woodard, J., dissenting.
I respectfully dissent from the majority's opinion concerning its affirmation of the workers' compensation judge's (WCJ) decision, which attributed values to the fringe benefits, for which Mr. Balthazar began the instant litigation.
A thorough review of the record reveals that neither party placed into evidence any specific values for Mr. Balthazar's fringe benefits. The record only contains documents which call for speculation. For example, Mr. Balthazar attempted to meet his burden of proving values, regarding the house's rental value, by submitting into evidence various photographs of the house's amenities and nothing more. This is not competent evidence of values, and it required the court to speculate as to the house's fair rental value, rendering a decision which had no rational basis in the record.
Because there is no reasonable basis in the record for the trial court's decision, it appears that the only legal mechanism it could have used to discern Mr. Balthazar's fringe benefits' value would have been by taking judicial notice of them. However, courts usually resort to using judicial notice, in order to dispense with formal proof, when there is no genuine necessity for the proof and when judicially noticed facts appear indisputable, either as a matter of notorious common knowledge, or as being easily capable of immediate verification.[1] Specifically, the law stipulates *19 that facts may be fit for a court's judicial notice when they are "[g]enerally known within the territorial jurisdiction of the trial court"[2] or when they are "[c]apable of accurate and ready determination by resort to sources which accuracy cannot reasonably be questioned."
In the instant case, regarding fair market rental values for example, even if one lives in the locale in question, determining values of real estate requires factoring in many variables, any one of which can alter the final conclusion and all of which are debatable. Thus, a property's fair rental value does not appear to be a matter which is appropriate for using judicial notice as a substitute for evidence.
Accordingly, I would reverse the WCJ's decision and remand the case to the WCJ for the court to reopen the record and receive additional evidence regarding the fringe benefits' value.
NOTES
[1] S.J. Lemoine, Inc. v. St. Landry Parish School Bd., 527 So.2d 1150 (La.App. 3 Cir. 1988).
[2] La.Code Evid. art. 201(B)(1)