668 So.2d 1161 (1996)
Velma J. COCHENNIC
v.
DILLARD'S DEPARTMENT STORE WAREHOUSE.
No. 95-CA-705.
Court of Appeal of Louisiana, Fifth Circuit.
January 17, 1996.
Writ Denied March 15, 1996.
*1162 Matthew J. Ungarino, David Bordelon, Ungarino & Eckert, Metairie, for Appellant, Dillard's Department Store.
R. Jeffrey Bridger, Lea & Plavnicky, New Orleans, for Appellee, Velma J. Cochennic.
Before DUFRESNE, GOTHARD and CANNELLA, JJ.
CANNELLA, Judge.
Appellant, Dillard's Department Store, appeals from a judgment of the Office of Worker's Compensation in favor of appellee, Velma Cochennic. We affirm.

FACTS
Appellee, was employed at appellant's warehouse in St. Rose, Louisiana on September 21, 1991 when she injured her shoulder as she hoisted boxes onto an overhead pulley. *1163 She began to experience a loss of sensation in her hand and fingers almost immediately and went to the emergency room at Ochsner Foundation Hospital (Ochsner) where she was treated for a sprain. Early on September 23, 1991 appellee awoke with severe pain in her right shoulder and was taken to the emergency room at River Parishes Hospital. She was given an injection for pain. About noon that same day, she awoke with gradually increasing shoulder pain, numbness in her hands and legs and unable to move the lower part of her body. She was hospitalized at Ochsner, but after the failure of appellant to assume responsibility for her medical expenses, was moved to Louisiana Rehabilitation Center (LRC), a division of Charity Hospital. She remains numb in her lower body and has, among other problems, poor balance and great difficulty walking. Following denial of liability by appellant, suit for worker's compensation benefits was filed. On September 26, 1994 a judge trial was held and judgment was rendered on December 16, 1994. The hearing officer determined that appellee was temporarily totally disabled and he ordered appellant to pay worker's compensation benefits from September 21, 1991 and continuing until her condition changes, plus all past and future medical expenses. Appellant was also found to be arbitrary and capricious and attorney fees of $4,500 plus penalties and interest were also assessed. It is from this judgment that appellant now appeals.

EVIDENCE AND TESTIMONY
For reasons which do not appear in the record, the court reporter failed to get a complete transcript of the trial. However, for purposes of this appeal, the parties agreed to designate the record by joint stipulation. A narrative of facts was submitted by agreement of the parties, in lieu of the unavailable portion of the trial transcript, along with a partial transcript of trial testimony (20 pages), trial exhibits, all claim forms, pleadings, memoranda, rulings, orders, the judgment and reasons for judgment. The written joint stipulation contained the proviso that counsel did not stipulate to the correctness of conclusions of law or conclusions as to expert medical opinion.
In the partial transcript available, appellee testified that in September of 1991, she was employed at appellant's warehouse in St. Rose, Louisiana, tagging and transferring garments from racks to rolling racks to be shipped to the various stores. Sometimes she picked up ten to fifteen garments at a time, depending on the bulk of the garments. On the day of her injury, she was working overtime in the different job of disposing of garment boxes. She cut the boxes, then placed them on the conveyor belt about four feet over her head. She took three boxes, about two and one half feet wide and threw them up to the conveyor belt. Because the last box looked like it was going to fall, she turned around to reach for it and in doing so, felt a sharp pain in her shoulder. She went back to work, then to a coffee break a few minutes later. When she went to drink her coffee, she could not feel the cup in her hand. Frightened, she told her supervisor, Faye Bush, who told her to rest. A half hour later, her fingers and arm felt as though they were going to sleep. The plant manager told her to go home and, if there was no improvement, to go to a doctor. She could not drive because by that time her leg had started to feel "sort of funny." as though it too was going to sleep. Her husband took her to the emergency room at Ochsner. Following x-rays and examination, she was told that she had pulled some muscles and nerves in her shoulder. They gave her a prescription for pain and immobilized her arm, which continued to feel "asleep." On the following Monday morning, she awoke and could not get back to sleep because of pain in her shoulder and neck. In order to move she had to drag her body. She went to River Parishes Hospital where they told her the same thing as had the doctors at Ochsner, that she should go home and let the medicine work. At about noon that day she was completely unable to move her body and she was unable to feel her lower extremities.
According to the stipulation, appellee became aware that she had no feeling from mid-chest down at noon on Monday, September 23, 1991. Her husband took her to Ochsner, stopping at appellant's warehouse to report her worsening condition and to request *1164 authorization to go to the hospital. She was admitted at that time and treated there through October 14, 1991, to the best of her knowledge, for a spinal injury, paralysis and the loss of feeling from the mid-chest down. She continued to have trouble with her shoulder and received pain medication for this shoulder injury. She was aware of one visit while at Ochsner from a representative of appellant, who told her that appellant believed that she had suffered a stroke and would not be responsible for her injuries or medical expenses. Appellee received nothing in writing with regard to this denial of responsibility and there was no further contact from appellant. Because appellant denied responsibility, appellee was transferred to LRC. She still had no feeling in her lower body, could not walk and still had shoulder pain. She was unaware of appellant having investigated her accident, or of contacting her doctors.
She eventually learned to walk, with the aid of a four-pronged cane, although she did not recover feeling in the lower body. She was discharged in November, 1991, but treatment for both her spinal and shoulder injuries continued on an out-patient basis at Charity's spinal nerve and physical medicine clinics. At the time of trial, she still had no feeling from the mid-chest down, experienced constant pain in her shoulder and, although she had begun to walk some without a cane, she was still limited by lack of endurance and poor balance. She testified that she is unable to work because of poor balance, illustrated by her inability to pick up darts unassisted (she had previously been a very good dart player) and two falls she suffered due to lack of balance and feeling in her feet. Appellee testified that she is concerned about the lack of feeling, since she cannot feel wounds on her lower body. She has suffered cuts and burns on her feet which she could not feel. She has looked for work but has not found anything she can do. Her sources of support are Supplemental Security Income and Social Security. Her husband has died since the time of the accident.
Appellee believes that she has suffered a spinal cord injury rather than a stroke. On cross-examination, she identified her signature on an application for disability insurance benefits, which indicated that she was suffering from a "spinal cord stroke." The form bore another person's handwriting, and she could not recall having seen the particular document before and did not herself fill in the information. She did state that she was presented with many forms at LRC which she understood that she had to sign to obtain medical treatment. She testified that she always heals normally from injuries suffered and never had any symptoms of loss of feeling or paralysis or stroke prior to her accident injury herein. Since the accident, she has suffered no additional paralysis or stroke-type malady and could not think of anything other than her on-the-job injury that might have caused her injuries.
Michael Oates (Oates), appellee's nephew, testified that he has lived with appellee for the last fifteen years. He stated that she had been in normal health prior to the accident. Since then, he has observed her receive shots in her abdomen with no indication that she had any sensation from the shot. He also observed her legs shaking in spasms of which she was unaware and, on at least one occasion, observed her lose her balance while walking in her house and fell with such force against a wall that she knocked herself out.
At trial, the parties stipulated that Diane Jesse, a family friend and two of appellee's children, would testify consistently with Oates. It was also stipulated that, if appellant called Kathy Bates and Bobbi Weber, their testimony would be in accordance with the documents prepared by them and admitted as exhibits at trial.
Joint Exhibit 1 was appellant's report of injury dated September 24, 1991 on which a "possible dispute" is noted. Her discharge summary from Ochsner indicates that the history of her complaint, as given by appellee, indicated that the pain in her shoulder was secondary to the work injury. Tests were negative and/or normal. It was decided that she had "anterior spinal artery syndrome." She required catheterization and was able to partially move herself to a wheelchair and she was "wheelchair bound." At *1165 LRC, she was given Elavil, among other medications.
The deposition of Dr. Robert Barron, appellee's treating physician for a time at Ochsner, was admitted into evidence. He is a board certified neurologist practicing at Ochsner. When he first saw appellee she was paraplegic with no movement of either lower extremity and a loss of pain perception or analgesia from mid-chest down. His initial impression was that she had suffered an acute myelopathy, an acute insult to the spinal cord at the T-4 level. Because of the nature of her neurological deficit, the "presumptive diagnosis" was an anterior spinal artery thrombosis(clot). Appellee had no aortic disease, no vascular or collagen disorder and tests for multiple sclerosis and other diseases were negative. Magnetic Resonance Imaging (MRI) showed no cord compression from a herniated disc or tumor. When asked of the cause of her condition, he answered:
We don't know. We don't have a cause. We don't know a cause ... if it was a transverse myelitis, the cause of that is almost always unknown. I mean that is a big unknown. If it were an anterior spinal artery thrombosis, we don't know the cause for that either.
Dr. Barron stated that her condition cannot be treated surgically and the degree to which she may recover is uncertain. He stated that there was a temporal relationship between the accident and the paraplegia:
I can't tell you that there was no causal relationship between the two things, but I don't know what the mechanism would have been.
He thought that there was no mechanical compression of the spinal cord and the etiology of appellee's condition remains unknown.
Other medical records were submitted. In her evaluation from Charity, the history given in the reports begins with appellee's description of the incident at appellant's warehouse. None of the other medical information contradicts the diagnoses of Dr. Barron, nor is there given anywhere, in any of the medical information, an alternative opinion as to the cause of her physical condition.

DISABILITY ANALYSIS
As we understand the reasons for judgment, the hearing officer determined that appellee had met her burden of proving that her present disability resulted from the accident. Our Supreme Court stated in Quinones v. U.S. Fidelity and Guar. Co., 93-1648 (La. 1/14/94), 630 So.2d 1303 as follows:
In a worker's compensation case, the plaintiff/injured employee bears the initial `burden of establishing the causal connection between the disability and the employment accident by a reasonable preponderance of the evidence.' It is not necessary for the plaintiff to establish the exact cause of the disability, ... but it is necessary for the plaintiff to `demonstrate by a preponderance of proof that the accident [that was] sustained has [a] causal relationship with [the] disability.' Russell v. Employer's Mutual Liability Insurance Co. of Wisconsin, 246 La. 1012, 169 So.2d 82, 88 (La.1964). This causal relationship can be demonstrated, creating a presumption that the accident caused the disability, when an employee proves that before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that there is sufficient medical evidence to show there to be a reasonable possibility of causal connection between the accident and the disabling condition. The establishment of this causal relationship serves to create a legal presumption that the injury caused the disability. After an employee successfully `establishes the presumption of a causal relationship, the party denying the existence of a presumed fact assumes both the burden of producing evidence and the burden of persuasion on the issue.'
In Hammond v. Fidelity & Cas. Co., 419 So.2d 829 (La.1982), the court discussed the weight of medical evidence thusly:
... medical testimony `must be weighed in the light of other credible evidence of a nonmedical character, such as a sequence of symptoms or events in order to judicially determine probability' ...
*1166 Schouest v. J. Ray McDermott & Co., 411 So.2d 1042, 1044-45 (La.1982). See also Peveto v. WHC Contractors, 93-1402 (La. 1/14/94), 630 So.2d 689.
Appellee established at trial that she was in good health prior to the accident but, immediately afterward, began to feel numbness in her fingers and hand while still at the warehouse and had begun to experience the same problem in her leg, making her unable to drive home. The testimony is that those symptoms continued to increase until she became paraplegic.
The medical reports evidence shows that no exact etiology of appellee's condition has or could be determined, although many tests and examinations were conducted which excluded most hypotheses such as multiple sclerosis or other disease. Dr. Barron would not rule out the connection between the accident and appellee's condition. We agree that the medical and lay evidence, including the sequence of symptoms and events, establishes a reasonable possibility of a causal connection between the accident and appellee's disability. In a worker's compensation case, as in other cases, the appellate court's review is governed by the manifest error or clearly wrong standard. Smith v. Louisiana Dept. of Corrections, 93-1305 (La. 2/28/94), 633 So.2d 129. Appellant presented no evidence to rebut the presumption. The finding of disability within the framework of the worker's compensation law is a legal, rather than purely a medical, determination. Jackson v. A.I.A., 94-371 (La.App. 5 Cir. 11/16/94), 646 So.2d 1088. In the present case we find no manifest error in the finding that appellee had carried her burden of proof. Furthermore, the medical evidence and lay evidence are clear that she remains totally disabled at the present time. In this regard, we take particular notice of the lack of any evidence submitted by appellant relative to a disability evaluation or rehabilitation of appellee, or any evidence that she is able to perform any work that exists in her community.

PENALTIES
Appellant also urges error in the determination of the hearing officer that it was arbitrary and capricious in handling the matter and in not investigating the claim.
The record discloses that appellant engaged Executive Risk Consultants (Executive Risk) to handle the compensation claim. Executive Risk, through Kathy Bates, retained Conservco to be the medical care coordinator. On October 2, 1991, Bobbi Weber, medical case manager at Conservco, visited appellant at Ochsner and on October 9 wrote the initial report. In that report, Weber wrote:
I think it is important to note that Mrs. Cochennic denied specific and/or direct trauma to her arms and legs. The consensus gleaned from the medical record is that her current condition is not related to the worker's compensation injury. Her shoulder pain may in fact have been a symptom of her impending stroke....
RECOMMENDATIONS
1. Continue monitoring Mrs. Cochennic's medical progress.
2. Follow-up with the rehabilitative program when she is admitted.
3. Once the client reaches maximum medical improvement, refer her for vocational counseling if necessary.
On November 14, 1991, Bates wrote a "Closure Report" in which the following was stated:
The medical record review and interview were utilized to determine that there was no relationship between the initial injury and the medical condition for which Mrs. Cochennic was hospitalized.
After the initial contact, a low profile was maintained at the request of the account. The file is being closed at the request of the account.
Because the determination was made early on that there was no relationship between the initial injury and Mrs. Cochennic's medical condition which resulted in hospitalization at Ochsner Foundation Medical Center and at LRI for rehabilitation services, the savings on this case were dramaticthe entire hospital and rehabilitation bill.
*1167 The hearing officer found that "this was, to say the least, a cursory decision on the part of defendant and their representative."
Appellant determined on September 24, 1991 before any investigation whatsoever, that there was a "possible dispute." Its representative, a registered nurse, determined from her interpretation of the medical records that there was no causal connection between appellee's condition and the accident. Appellant did not follow its own representative's recommendations, for example, vocational counseling. Before November 14 appellant had determined to keep a low profile and, as of that early date, the file was closed.
We find that the hearing officer did not err in awarding penalties and attorney fees. An employer who fails to investigate an employee's compensation claim subjects itself to statutory penalties and attorney fees. Nelson v. Roadway Exp., Inc., 588 So.2d 350, 355 (La.1991). An unjustified belief that an employee's injury did not result from an accident does not excuse failure to pay worker's compensation benefits. Nelson, supra. This is because an insurer is required to make a reasonable effort to ascertain an employee's exact medical condition before benefits are terminated. Nelson, supra; Orgeron v. Tri-State Road Boring, Inc., 434 So.2d 65 (La.1983). This obligation is continuing in nature. Therefore, if after an initial optimistic report, an insurer receives medical information indicating the possibility of continuing disability, the insurer may not blindly rely upon the earlier report to avoid penalties for arbitrary nonpayment of compensation benefits. Nelson, supra; Walker v. Gaines P. Wilson & Son, Inc., 340 So.2d 985 (La.1976).
The evidence adduced at trial establishes that appellant determined, almost at the outset, that the claim would be disputed, made a perfunctory investigation and then closed its file almost immediately. It has denied responsibility for medical expenses from the outset and has never paid compensation benefits. Under the circumstances of this case, in which there has been neither proven nor postulated an intervening cause for appellee's condition, such as another accident or other medical condition or disease, in the absence of any contact with appellee's treating physician and the lack of any medical opinion that appellee's condition was not accident related, we find no manifest error in the determination by the hearing officer that appellant was arbitrary and capricious and has rendered itself liable to penalties, interest, and attorney fees under La.R.S. 23:1201 et seq.

DECREE
For the foregoing reasons, the judgment of the Office of Worker's Compensation in favor of appellee and against appellant is affirmed. Appellant is assessed all costs of appeal.
AFFIRMED.