13CANNELLA, Judge.
Defendant, Brown & Root, appeals a workers’ compensation judgment finding Plaintiff, Kaylem Matherne, entitled to medical benefits and supplemental earnings benefits (SEBs) due to a toxic chemical exposure, and awarding Plaintiff penalties and attorney’s fees for Defendant’s arbitrary and capricious failure to provide benefits. We affirm in part and remand for further proceedings.
For several months prior to March 16, 1999, Plaintiff had been employed by Defendant and assigned to the Shell Oil Company (Shell) chemical plant in Norco, Louisiana. During the three to four weeks before the exposure, Plaintiff and several others were working in a large mixing kettle that had been idle for nine months. Preparatory to using it again, the workers created clouds of powder in the air by removing with jack-hammers a substance that had solidified on the sides of the tank. The workers wore rubber suits, gloves, and fresh air respirators for protection. However, Plaintiffs respirator fit imperfectly, as he |ahad not been specially fitted to it and the ties of the suit did not tie tightly. Thus, the powder crept under the mask and suit.
On the day of the exposure, Plaintiff, Jimmy McGuire (McGuire), and William Hughes (Hughes) were working the midnight shift. At approximately 2:00 a.m., they were inside the kettle removing the mixing shaft and blades, which had bent when the substance hardened. During this process, they wore rubber gloves and fresh air breathing respirators, but the suit protection had been downgraded to paper. Using an impact wrench, they disconnected one of the flanges securing the shaft so that it could be lifted out. As the impact wrench struck the flange, it spun off of the shaft and sprayed the workers with a small amount of the chemical phenol. The phenol had collected in a groove or open space between the pieces of equipment. Its source was unknown. The phenol struck Plaintiff and the other two men on unprotected areas of their heads and necks. They immediately stopped working and notified their Brown & Root supervisor. Although the supervisor did not know what the substance contained, he nevertheless decided that it was oil and told the men to continue working to remove the shaft. None of the men knew that it actually was phenol, which is extremely toxic and easily absorbed into the body through the skin. However, they could smell it when their masks were removed and it also produced a taste in their mouths. In addition, it caused a burning sensation where it touched the skin.
When the shaft was released, McGuire and Hughes hauled it out of the tank. Plaintiff stayed to finish cleaning the walls with a chisel. The other two men went to the nearby operator’s office where the operator, a Shell employee, recognized the odor of phenol on the men. Because of its toxicity, the job was immediately shut down by Shell. Plaintiff was told to get out of the tank, where |4he removed his protective clothing. He and the others *553 waited for at least 20 minutes for further instructions, during which time the phenol odor was strong and was being inhaled by them. Eventually, a Shell emergency medical technician arrived and instructed Plaintiff, McGuire and Hughes to shower in the nearby emergency showers and to continue to wash until all trace of the phenol was removed. The workers complied. Approximately one hour passed from the time of the exposure to the time that Plaintiff and the others were told to shower. After waiting around for some time for further instructions, Plaintiff eventually went home because he had a long distance to travel. No one had the employees medically treated or tested at that time.
Approximately 31 hours later, Plaintiff and the others were sent to Elmwood Industrial Medical Center to be tested. The results of Plaintiffs laboratory tests showed phenol levels in his blood of 25.8 milligrams per liter. The normal level is from zero to 19.9. Another indicator, the phenol creatinine level, was 28.3 milligrams per gram of creatinine, the norm being zero to 49.9. Although he had begun to have headaches, he did not complain at that time to the medical personnel because they were mild. However, he gradually developed severe headaches, nausea, dizziness, loss of balance, vision blurring, insomnia and fatigue, but continued to work for Defendant until he was laid off in a job cut-back.
Three weeks later, on April 9, 1999, Plaintiff was involved in an automobile accident. He was treated for back and neck complaints for the next six months. In the meantime, he attempted to have a specialist examine him for exposure to phenol, but Defendant refused to approve further medical care.
|sOn July 27, 1999, Plaintiff filed a Disputed Claim for Compensation alleging that his symptoms, which were worsening, resulted from his exposure to phenol. Trial was held on September 7, 2000. On September 25, 2000, the trial judge rendered a judgment in Plaintiffs favor, finding that Plaintiff carried his burden of proof that he suffered a work-related accident causing disability when he was exposed to phenol and awarded Plaintiff medical benefits and SEBs. He also found that the Defendant was arbitrary and capricious in denying benefits and awarded penalties of $2,500 and attorney’s fees of $2,500 to Plaintiff.
On appeal, Defendant contends that the trial judge erred in finding that the headaches were caused by the phenol exposure, rather than the automobile accident. Defendant further contends that the trial judge erred in his finding that Defendant was arbitrary and capricious in refusing to provide benefits to Plaintiff, and in awarding penalties and attorney’s fees for that failure. The Defendant alternatively asserts that the case should be remanded for a determination of Plaintiffs earning capacity and the date of entitlement to SEBs.
According to Plaintiff, for three to four weeks prior to the incident in which he was sprayed with the phenol, he was engaged in cleaning the kettle. During that work, he was exposed to a powder that resulted from breaking up the hardened substance on the walls of the tank. He did not know what was in the substance, but he felt that it was irritating to the skin.
When the phenol sprayed on Plaintiff and his co-workers, it struck exposed skin on Plaintiffs forehead and the side of his neck, causing a burning sensation. After he got out of the tank, while he was waiting for instructions, he and the others removed their masks, so that he was breathing fumes from the phenol. Accord *554 ing to the witnesses, phenol has a very-strong, distinctive odor.
| fiApproximately one hour passed before he was told by the medical technician for Shell to take a shower to wash off the substance. He was told to keep washing until the burning sensation stopped. Plaintiff stated that he showered three times, for approximately 15 minutes each time, before the burning subsided. Plaintiff testified that his urine was a dark orange color for a few days after the exposure, that his headaches started immediately after the exposure, but that their severity increased gradually. He said that they were not remarkably severe until several days later. That is why he did not mention headaches when he was taken to Elmwood Industrial Medical Clinic for testing.
Plaintiff testified that the onset of his other symptoms, including fatigue, blurred vision, loss of balance and depth perception, anxiety, numbness, insomnia, nausea, and irritability, were also gradual, and that those symptoms became noticeable three weeks later. This time frame coincided with the auto accident in which his car was struck from the rear by another vehicle. However, Plaintiff stated that his symptoms existed before the accident. He said that he told the supervisor at the job-site about the headaches. Although he claimed that he was only treated for a back injury from the auto accident, he did not dispute Dr. Douglas Davidson’s report that he also treated him for neck spasms.
Plaintiff testified that for the following two or three months, he attempted to find a doctor familiar with chemical exposure to examine him. However, he attempts were unsuccessful because, after being told it was a workers’ compensation case, he was not called back. Apparently, Defendant refused to approve the visits. When the Shell plant job ended, Plaintiff went to Texas to work. Because he was still having headaches and other symptoms, he was approved to see Dr. Alexander Stock, through Defendant’s Health at Work 17program. Dr. Stock’s report was admitted into evidence. In that report, the doctor states that the phenol exposure was unlikely related to the symptoms, but he needed to conduct a more detailed review of the literature. Another doctor at The Heath at Work clinic recommended in the progress report that Plaintiff obtain blood work, a chest x-ray, and Electrocardiogram (EKG) and Computerized Axial Tomography (CAT) scan, which Defendant failed to approve and was never done.
Plaintiff continued to work after the exposure, but discovered that the dizziness and balance problems made it unsafe to perform his normal duties as an iron worker. Iron workers generally hang steel or are involved in other work which requires the ability to work at different heights. Eventually, he obtained various jobs working on the ground, but the fatigue caused problems because he was having trouble keeping up. As of the date of trial, he had not received any vocational rehabilitation and was not working.
Plaintiff stopped pursuing medical treatment for a time because Defendant would not approve any further testing. However, he was still suffering from the symptoms. When he returned to the New Orleans area after leaving Texas, he went to Dr. D.C. Mohnot, a neurologist, on March 27, 2000. Plaintiff complained to the doctor of the same symptoms that had commenced within weeks of the phenol exposure. He told Dr. Mohnot about the car accident, but said that he only suffered an injury to his back. However, Dr. Mohnot said that the severity of Plaintiffs headaches did not change after the accident. The doctor prescribed three different medications for the headaches and testified *555 that further medical tests are warranted. Plaintiff received neither because Defendant refused to approve the expenses and Plaintiff cannot afford them on his own.
| RPr. Mohnot testified that the headaches are causally related to the phenol exposure. Although he had not treated anyone for symptoms related to phenol exposure in the past, the doctor based his opinion on the original tests showing phenol in Plaintiffs system, the history given by Plaintiff and his review of the medical records and the Material Safety Data Sheet (MSDA) provided by Shell. He stated that Plaintiffs symptoms are consistent with phenol exposure because he has no previous history of severe headaches. Dr. Mohnot also stated that Plaintiff is disabled from his work because the headaches cause dizziness and loss of balance which precludes Plaintiff from working at heights, a prerequisite for an iron worker. He stated that Plaintiff can perform light duty work on the ground that is non strenuous and that does not subject him to too much noise or heat, which would trigger his symptoms.
McGuire, one of Plaintiffs co-workers, was also sprayed with the phenol. He supported Plaintiffs version of the events. He thought that the tank had originally contained epinol that had hardened. He stated that during the weeks before the phenol exposure, the powder from the hardened substance would creep onto the skin around the neck. Prom there, sweat would cause it to run further down into the suit onto other body parts. McGuire stated that none of the men were told what chemicals they might encounter or what to do if they encountered any. McGuire testified that the phenol sprayed all over the three men in the kettle, covering masks and suits. In addition, when they removed their gloves to take off their masks and suits, the substance then got on their hands. McGuire said that the odor was strong, but they could not smell it when the respiratory masks were in place. While waiting for instructions, they breathed the odor for at least 30-35 minutes. Both he and Plaintiff stated that they could taste the phenol. 1 ¡After the men were tested at Elmwood, they were told that there was nothing to do for the exposure and that the substance would work itself out of the body.
McGuire testified that he suffered the gradual onset of nausea, severe headaches, loss of balance and dizziness. He received treatment for his dizziness, which he pays through another insurance company. He also suffers from irritability and insomnia, and is now restricted from climbing because of his symptoms. He still works for Defendant, but in an easier position.
Hughes, the third worker in the tank with Plaintiff is also still working for Defendant at the Shell plant in a light duty position. Hughes testified to the. same events and symptoms as Plaintiff and McGuire.
Joseph Ragan (Ragan), a Supervisor for Defendant for 10 years in that area of the Shell plant, testified that the kettle had been idle for nine months. He stated that the last chemical mixed in the tank was epinol and that phenol is not an ingredient of epinol. He noted that no one else had problems during or after the breaking up of the hardened epinol.
Ragan testified that the groove in which the phenol had collected was small and thus, the amount of the spill was minimal. He said that the shaft flange was solid and its diameter was six to six and one-half inches. He claimed that the area into which the phenol was pressured was only lk inch. However, he was not on duty when the accident happened. Plaintiff disputed this testimony. He claimed that the flange that released the phenol oil was a slip-on *556 type. Plaintiff said that the slip-on flange has a larger depth and more space for the phenol to collect than the type described by Ragan.
Plaintiffs expert, William Sawyer, Ph. D., testified by deposition. He is a toxicologist, teacher, public health toxicology consultant, laboratory director and | ineditor of a toxicology review. He reviewed Plaintiffs history, medical reports and notes, the MSDS on phenol and the deposition of Dr. William George, Ph.D., Defendant’s expert toxicologist, and various publications. He also interviewed Plaintiff. In his opinion, Plaintiff received a high level of phenol exposure from both the oil spray and during the weeks leading to the shaft removal. He stated that the workers did not have the proper protection during the transfer of the respirable dust during the cleaning process and that the paper suits had no capacity to prevent infiltration of the phenol. Dr. Sawyer stated that Plaintiffs symptoms are consistent with phenol exposure. The symptoms for this kind of exposure have been known since the 19th century and they include headaches, dizziness, burning, visual blurring, depth perception problems, fatigue and irritability. Further, the fact that it showed up in the blood and urine 31 hours later reveals a high level of phenol exposure, which he stated was absorbed through Plaintiffs skin, the fumes from the oil and inhalation of the dust.
The doctor cited various publications as the basis for his opinion. He stated that the pure form of phenol is a colorless-to-white solid, but the commercial product, which this would have been, is a liquid. Dr. Sawyer stated that phenol is in the highest classification of health hazards and is very toxic, whether ingested, inhaled or absorbed through the skin. He added that Plaintiff was working hard when exposed, raising his metabolic rate, and that a high metabolic rate and Plaintiffs smoking history makes Plaintiff more susceptible to the toxicity of phenol. Furthermore, he noted that these men did not get the proper after-exposure care nor were they properly protected at the time the oil sprayed on them. He cited the MSDS, which states that immediate medical Inattention should be given when a person is exposed to phenol because most of the phenol that gets into the system, 80%, is excreted from the body within the first 24 hours. Delayed attention diminishes the ability to determine the extent of injury from the exposure. Here, 31 hours later, Plaintiffs tests showed that he still had a high, toxic level of phenol in his system. The doctor stated that it is not possible to “adjust” the phenol urine concentration by looking at the creatinine concentration because the urine sample was not collected on the same day as the exposure. Thus, unlike Dr. George,- he did not consider the normal range of the creatinine concentration to be a factor in determining the actual level of exposure. He concluded that the phenol level after 31 hours as measured at 25.8 mg/L must be directly interpreted as in excess of the reference interval of 0-19.9 mg/L.
Dr. Sawyer testified that Plaintiff should be given a neuropsychological exam to test memory, critical thinking, thinking impairment, and gross and peripheral neurological studies. Based on Plaintiffs continuing problems and the literature on phenol poisoning, Dr. Sawyer said that the symptoms will be relatively permanent. At any rate, Plaintiff needs testing so that an appropriate treatment regime can be instituted to improve his condition.
Defendant’s expert, Dr. George is a teacher in the psychiatry, neurology and environmental health departments at the Tulane University School of Medicine. He is also Director of Toxicology for the *557 school and the toxicology laboratory director. After reviewing the MSDA, Defendant’s incident report, Plaintiffs deposition and the medical records, he concluded that the exposure was so minimal that Plaintiffs symptoms cannot be linked to the small amount of phenol sprayed on the workers. However, he was under the impression that Plaintiff did not inhale the fumes, which he did, and that the time period beforejjghe showered was only 20 minutes from the exposure, rather than one hour. He stated that the lab results on March 18,1999 showed a minimal elevation. Further, he found the normal level of creatinine a significant factor. He explained that the creatinine level is a measure of renal function and eliminates the issue of urine dilution or concentration.
Dr. George researched 13,000 long-term chronic headache cases and found none related to phenol exposure. He agreed that phenol can cause short-term headaches, but stated that any effects are routinely resolved without tissue damage within 24 — 48 hours. The doctor agreed that serious exposure could result in severe symptoms. However, he attributed Plaintiffs symptoms to previous flash burns (for his eye problems), the auto accident three weeks after this incident, and/or poor dental hygiene. Dr. George noted that Defendant did not investigate the kettle to determine what the product in the tank that the workers were being exposed to during the weeks preceding the phenol exposure.
The MSDS provided by Shell describes the symptoms and dangers of exposure to phenol. This document states that phenol is extremely toxic and irritating to the skin and that it can be fatal if even moderate amounts are absorbed through the skin. The signs and symptoms are irritation and central nervous system depression, which may be evidenced by giddiness, headache, dizziness and nausea. It can cause liver, kidney and heart damage, and respiratory irritation. The MSDS states that the vapors should not be inhaled and that the symptoms listed in the MSDS can be caused by ingestion, inhalation or skin absorption.
The employee in a workers’ compensation case has the burden of proving that an accident occurred in the course and scope of his employment, that the |isaccident caused his injury and that the injury caused his disability. Plaintiff bears the burden of establishing the causal connection between the disability and the accident by a reasonable preponderance of the evidence. Quinones v. U.S. Fidelity and Guar. Co., 93-1648 (La.1/14/94), 630 So.2d 1303, 1306-07; Araujo v. Marriott Corp., 98-1129 (La.App. 5th Cir.3/30/99), 731 So.2d 432, 437; Cochennic v. Dillard’s Dept. Store Warehouse, 95-705 (La.App. 5th Cir.1/17/96), 668 So.2d 1161, 1166; writ denied, 96-C-0419 (La.3/15/96), 669 So.2d 417.
Additionally, the appellate court’s review of the workers’ compensation judge’s findings of fact is governed by the manifest error or clearly wrong standard. Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129, 132; Cochennic, 668 So.2d at 1161; Starkman v. Munholland United Methodist Church, 97-661 (La.App. 5th Cir.1/14/98), 707 So.2d 1277, 1284, writ denied, 98-0400 (La.3/27/98), 716 So.2d 891. The manifest rule extends to credibility determinations based upon conflicting medical testimony. Starkman, 707 So.2d at 1284.
Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as *558 reasonable. However, where documents or objective evidence so contradicts a witness’s story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness’s story, the court of appeal may find manifest error, even in a finding based upon a credibility determination. Rosell v. ESCO, 549 So.2d at 840, 844-45 (La.1989); Stobarb v. State, Through DOTD, 617 So.2d 880, 882 (La.1993). The issue to |14be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Stobart, 617 So.2d at 882. Thus, where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Id.
In this case, the trial judge determined that Plaintiff suffered a phenol exposure that caused his symptoms and present disability. The experts’ opinions were opposed to each other, but the totality of the evidence indicates that Plaintiff suffered a toxic exposure that is the cause of his present symptoms. Thus, after our review, we find no manifest error in the trial judge’s conclusion.
The trial judge awarded Plaintiff SEBs. Defendant asserts that the case should be remanded for a determination of earning capacity and date of entitlement to SEBs. At trial, Plaintiff testified that he worked almost continuously for one year following the exposure for wages ranging between $15 per hour and $26 per hour. He stopped working because of a layoff and collected unemployment benefits for five months. While employed by Defendant, he claimed an average weekly wage of $990 per week. Plaintiffs last job was in March 2000, but he has not been able to find light duty type of work since that time that he can perform with his symptoms.
If the claimant proves that he cannot return to work due to work related injuries, then the burden shifts to the employer to prove that there are jobs available within the employee’s capabilities. Araujo, 731 So.2d at 437.
La. R.S. 23:1221(3) provides:
(3) Supplemental earnings benefits.
11B(a) For injury resulting in the employee’s inability to earn wages equal to ninety per cent or more of wages at time of injury, supplemental earnings benefits equal to sixty-six and two-thirds percent of the difference between the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis. Average monthly wages shall be computed as four and three-tenths times the wages as defined in R.S. 23:1021(10).
(b) For purposes of Subparagraph (3)(a), of this Paragraph, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sums actually received by the employee, including, but not limited to, earnings from odd-lot employment, sheltered employment, and employment while working in any pain.
(c)(i) Notwithstanding the provisions of Subparagraph (b) of this Paragraph, for purposes of Subparagraph (a) of this Paragraph, if the employee is not engaged in any employment or self-employment, as described in Subparagraph *559 (b) of this Paragraph, or is earning wages less than the employee is able to earn, the amount determined to be the wages the employee is able to earn in any month shall in no ease be less than the sum the employee would have earned in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, which he was physically able to perform, and (1) which he was offered or tendered by the employer or any other employer, or (2) which is proven available to the employee in the employee’s or employer’s community or reasonable geographic region.
(ii) For purposes of Subsubparagraph (i) of this Subparagraph, if the employee establishes by clear and convincing evidence, unaided by any presumption of disability, that solely as a consequence of substantial pain, the employee cannot perform employment offered, tendered, or otherwise proven to be available to him, the employee shall be deemed incapable of performing such employment.
It is unclear from the record whether Plaintiff can earn 90% or more of his previous wages. Further, the trial judge failed to establish a date for the benefits lifito commence. Thus, we find that the case must be remanded for a determination of Plaintiffs entitlement to SEBs.
Finally, Defendant asserts that the trial judge erred in awarding Plaintiff penalties and attorney’s fees for its arbitrary and capricious failure to provide benefits to Plaintiff. We find no manifest error in this determination. Defendant had the MSDS available to it with the symptoms of phenol poisoning and instructions for exposure, which it ignored. It was due to Defendant’s conduct that Plaintiff delayed getting the substance off and Plaintiff was not provided medical attention timely after the incident. He was forced to wait at least one hour before being told to shower, and 31 hours before he was tested for the phenol levels. Following the instructions for immediate medical attention would have provided significant information as to the level of phenol exposure so that treatment could have started or Plaintiff’s claims rejected. However, Defendant’s lack of concern interfered with anyone’s ability to discover the actual levels of phenol that the workers had been exposed to, yet it now seeks to take advantage of that fact to assert that the exposure was minimal. In addition, Defendant failed to immediately investigate the matter to determine exactly what was in the tank. After Plaintiffs test results showed abnormal phenol levels in his systems, Defendant still failed to provide follow-up medical attention.
No justification was provided at trial for these lapses at the time of the incident. Furthermore, no one testified as to why the medical treatment sought by Plaintiff was refused for more than one year. Based on the record, it did not seek the opinion of an expert toxicologist or medical doctor familiar with toxic exposure in this case until after Plaintiff filed his claim. It apparently assumed, without any evidence, that Plaintiffs problems resulted from the car accident, l17despite the fact that he complained of headaches prior to the car accident. In addition, Defendant failed to follow the advice of its doctors in Texas. Dr. Stock stated that it was unlikely that the headaches were caused by the exposure, but he also stated that he needed to do further research. In the report, another doctor stated that further tests were needed. Despite those recommendations, Defendant continued to deny testing or treatment for Plaintiff.
Based on these facts, Defendant failed to show any justification for failing to provide benefits to Plaintiff. Thus, we find that the trial judge did not err in finding *560 Defendant arbitrary and capricious in denying benefits to Plaintiff.
Accordingly, the judgment is hereby affirmed in part. The case is remanded for an evidentiary hearing on the Plaintiffs entitlement to SEBs. Defendant is to pay the costs of this appeal.
AFFIRMED IN PART; REMANDED.
SCHOTT, J. Pro Tern., dissented in part.