813 So.2d 1285 (2002)
Edward ADAMS
v.
BAYOU STEEL CORPORATION.
No. 01-CA-1392.
Court of Appeal of Louisiana, Fifth Circuit.
April 10, 2002.
Rehearing Denied May 6, 2002.
*1286 Richard M. Millet, LaPlace, LA, for Appellant.
Lawrence B. Frieman, Metairie, LA, for Appellee.
Panel composed of Judges EDWARD A. DUFRESNE, JR., JAMES L. CANNELLA and MARION F. EDWARDS.
EDWARDS, Judge.
Plaintiff/appellant Edward Adams appeals a judgment of the Office of Worker's Compensation confirming SEB benefits due to him by defendant/appellee Bayou Steel Corporation, but denying other relief sought. We affirm in part, reverse in part, and render judgment.
On March 5, 2001, Edward Adams filed a Claim for Worker's Compensation against Bayou for injuries sustained in a work-related accident on June 30, 2000. Adams claimed that while carrying a 3-4 foot long sample of hot steel, weighing between 60-75 pounds, with a pair of channel *1287 lock pliers, he felt a sharp pain in his back and numbness in his left arm. As a result, Adams claimed that he suffered from severe ulnar nerve neuropathy and had been temporarily totally disabled since the date of the accident. He had received Temporary Total Disability Benefits (TTD) from Bayou, which benefits were terminated on January 25, 2001. Adams claimed that his payments were arbitrarily and capriciously discontinued, and he requested interest, penalties, and attorneys fees.
On August 28, 2001, Bayou paid to Adams the sum of $7,410.60 in Supplemental Earnings Benefits (SEB) for the period of January 25, 2001 to August 30, 2001. Bayou also authorized a recommended surgical procedure on September 7, 2001.
Trial in the matter was held on September 13, 2001. According to Adams, at issue were the following items:
(1) whether the termination of TTD benefits in January was arbitrary, capricious, or without probable cause so as to trigger attorney fees;
(2) whether penalties and attorney fees were due for the late payment of SEB benefits and also for failure to timely authorize surgery;
(3) whether the correct indemnity benefits were paid;
(4) whether two separate penalties were due for terminating TTD and for failure to timely authorize surgery;
(5) whether Bayou should pay legal interest.
Following trial, the court found that Adams was entitled to SEB "which was properly paid by the Employer commencing January 25, 2001, with a wage earning capacity of $7.00 per hour." The court then held that the termination of benefits was justified, and denied all other relief. No reasons for judgment were given. Adams appeals.
Prior to trial, the parties stipulated that at the time of the accident, Adams' average weekly wage was $650.53, that the accident occurred within the course and scope of his employment with Bayou, and that as a result of the accident, Adams injured his upper back and left elbow. It was further stipulated that Dr. John Burvant was his choice of orthopedic physician, Dr. Cesar Roca was Bayou's choice of orthopedist, that Dr. Gordon Nutik was the Independent Medical Examiner, and that vocational rehabilitation services were provided by Mr. Michael Nebe.
At trial, Mr. Adams testified that in his employment as a lab technician at Bayou, it was his duty to inspect structural steel products to ensure they met appropriate standards. In so doing, he had to handle a sample every 15 minutes. The weight of the steel was approximately 22 pounds per foot. On June 30, the day of the accident, he was placing a sample and walked down about two steps with it when he felt a sharp pain between his shoulder blades, and his left arm was immediately numb. He continued his employment after that date, with restrictions, and eventually saw Dr. Reginald Ross on July 10, 2000. Dr. Ross obtained x-rays of the thoracic spine and an MRI of the cervical spine. Both studies were normal. Dr. Ross prescribed pain medication and restricted lifting to 10 pounds. Adams continued in Dr. Ross' care through August 28, 2000, at which time the restrictions continued.
Adams had been moved into an office at Bayou, and was laid off on December 4, 2000. On January 25, 2001, he was told to report back to work and report to the shipping office as a material handler. The position required a lot of climbing, throwing large pieces of wood and stacking steel. This was a more strenuous job than lab technician, and he advised the company that he still had some lifting restrictions, *1288 but was told that he had to perform the job without modifications. At that time, he had begun seeing Dr. Burvant, who told him he had ulnar nerve neuropathy and restricted limited lifting up to 30 pounds. Adams did not take the employment.
Initially, Dr. Burvant did not have the medical records from the other physicians whom Adams saw and did not relate the neuropathy to the accident. After reviewing the other medical records, Dr. Burvant felt the condition was due to the accident at work. At the time of trial, Adams was restricted to lifting less than 20 pounds with his injured left arm and could not perform all of the duties of his original position of lab technician. He has tried to return to work but has been unable to secure employment.
Mr. Nebe provided vocational rehabilitation services for Adams and sent him two letters with a listing of jobs. He did not apply for all of the jobs listed, but applied for at least 12 jobs in eight months. There was at least one job that he did not apply for because he felt it did not pay enough. He did not apply for another job because his father, a police officer, had arrested relatives of the business' owner. For a third job, he was never able to locate the business or contact them by telephone. He did not apply to another business because of its geographical location.
Mr. Adams made his own efforts to obtain employment, including internet searches.
Ms. Josie Wascom, an occupational nurse at Bayou, testified that she was present on January 25 when Mr. Adams was tendered the position of material handler. Also present was Hank Vasquez, Superintendent of Human Resources, and Carl Pignato, Human Resources Manager. The company had gotten a report indicating that Dr. Burvant permitted Adams to return to work at full duty. Adams showed a paper from Dr. Burvant indicating that he was still on limited duty, and told them he could not take the position because of the limitations.
Mr. Pignato testified that he had a report from the third party administrator, FARA, and Dr. Burvant, that Mr. Adams was cleared to return to work at full duty with no restrictions. He was in Mr. Vasquez's office when Mr. Vasquez addressed the duties of a material handler. They are required to drive a forklift, operate overhead cranes, climb stacks of steel to maneuver the steel bundles, lift dunnage and lay steel on top, stack steel, and use a chain saw. At times it would require lifting weights over 40 and up to about 60 pounds. Mr. Adams handed Mr. Vasquez a paper stating that he still had restrictions, but the witness did not read it personally. Mr. Pignato knew that within a couple of weeks, Dr. Burvant had modified his position relative to the causation of Adams' neuropathy. However, the company had already made its decision and Adams was not offered a job again. On January 25, the company understood only that there was nothing wrong with Mr. Adams. If Dr. Burvant said that Adams could not lift more than 30 pounds, then the witness could understand that Adams could not perform in that position. After the meeting, Adams was suspended and eventually discharged.
Mr. Charles Bjerke, an adjuster with F.A. Richard (FARA), took over the Adams case from adjuster Ms. Linda Blount in April of 2001. At that time, the case was in litigation, no benefits were being paid, and surgery was an issue. Surgery was not approved until August of 2001, when Dr. Burvant's office called for authorization. Mr. Bjerke knew that as of February 5, Dr. Burvant had related Adams's neuropathy to the work incident, and a February 9 report from Dr. Nutik, *1289 to the same effect, was also in the file. A functional capacity report was also in the file when the witness took it over. However, there were still "some issues" to be determined.
Ms. Linda Blount, an adjuster at FARA who initially handled the case, testified that she received the file in July, 2000. At that time, Mr. Adams was receiving SEB payments, as he continued to work in a modified capacity. On January 11, 2001, she received a document from Dr. Burvant that Mr. Adams could return to work immediately. The return-to-work slip also indicated medium duty with no lifting greater than 30 pounds, but the witness did not know whether his job required lifting in excess of that. Dr. Burvant hoped that in two weeks Adams would be able to return to full duty. The only injury that was work-related at that time was the injury to Mr. Adams's upper back, since Dr. Burvant had not related the elbow neuropathy to the accident. However, the restriction was not specifically related to either the back or elbow.
Ms. Blount was not present when Mr. Adams was offered the material handler's job. On January 25, she sent a fax to Dr. Burvant acknowledging the limitations and asking at what point Adams would be able to return to full duty. She communicated with Dr. Burvant on January 31, who stated that there were no objective findings and that the limitations were put on by Mr. Adams himself. Mr. Adams could work full unrestricted duty. On January 24, 2001, Dr. Nutik sent a report indicating that Adams suffered from ulnar nerve neuropathy in the left elbow and may need further treatment; on February 9, Dr. Nutik related this to the accident. Also in February of 2001, she received Dr. Burvant's report relating the condition and the accident, and indicating that nerve transposition may be appropriate. However, that report did not mention any work limitations. On a report from Dr. Blount received on March 10, restrictions were imposed and nerve transposition was being considered.
Ms. Blount stated that as of January 24, 2001, the problems and restrictions mentioned by Dr. Burvant involving the elbow were not related to the accident. Mr. Adams's benefits were stopped because the witness had the return-to-work slip, and Mr. Adams did not begin work. After receiving the report of March 5, the witness questioned the "mechanism" of the elbow injury, since the initial complaint was to his upper back. Because the matter was in litigation, depositions needed to be taken to clarify the issues.
According to Ms. Blount, the payments made just prior to trial were SEB payments based on jobs within his restrictions at the rate of approximately $7.00 per hour. The decision to make those payments was made after Dr. Nutik's deposition.
Mr. Michael Nebe, a vocational counselor, received Mr. Adams medical information and determined that his problems were with his mid back. There were conflicting opinions as to the reported symptoms, but Adams had been released for work with light to medium physical restrictions. A Functional Capacity Evaluation (FCE) was done, targeting jobs within the restrictions. According to the FCE, done in September of 2000, although Mr. Adams made a maximum effort, the tester found symptom magnification. According to the report, Mr. Adams could perform light level activity and "would not meet his previous work demands".
Mr. Nebe felt there was good potential for finding employment and two labor market surveys were done. Jobs ranging from light duty (lifting up to 20 pounds), light medium (up to 40 pounds), and was *1290 medium duty (up to 50 pounds) were found, and Dr. Burvant approved them all. However, he had not sent the results of the FCE to Dr. Burvant. The majority of the jobs paid about $7.00 per hour, and all were within a reasonable commute to La-Place. Although Mr. Nebe testified at trial that applying for 12 jobs in 8 months was not a strong effort, correspondence in July of 2001 indicated that Mr. Adams had made a "significant" effort to follow up on jobs. He did not know why Mr. Adams was not hired.
Medical reports entered into evidence indicate that Adams was initially seen by Dr. Reginald Ross, who restricted lifting to 10 pounds, and last saw Adams in August 2000. The restriction remained unchanged during that time.
On July 19, 2000, Dr. Cesar Roca diagnosed a mid thoracic interspinous ligament strain. He recommended physical therapy and found that Mr. Adams could return to work with a lifting limitation of 20 pounds. Dr. Roca noted that Mr. Adams complained of numbness in the upper left extremity since the injury. By August 14, the doctor felt he could return to work without limitations.
On August 18, 2000, Mr. Adams saw Dr. Burvant. Adams's main concern was the pain between his shoulder blades, with occasional numbness to his arm. The doctor diagnosed cervical strain with minimal degenerative changes and determined that Mr. Adams could return to work with a lifting limitation of 25 pounds. Physical therapy was recommended and he was given pain medication. By November 1, he was limited to light duty as his overall condition had not changed. Dr. Burvant awaited the results of a recommended FCE as well as of Dr. Nutik's examination.
In January 8, 2001, following EMG studies, Dr. Burvant diagnosed ulnar nerve compression but did not feel it was related to the accident and recommended a return to work. In his report of that day, he commented: "The patient states he cannot do his prior duties. I would like to have him start out at medium level duties limiting his maximum lifting to 30 pounds." In response to an inquiry from Ms. Blount as to when Mr. Adams could work full duty, Dr. Burvant replied: "hopeful[ly] patient would be able to advance to full duties 2 weeks after starting at medium duties." On January 31, the doctor signed a letter faxed to him by Ms. Blount agreeing with statements which indicated that the 30 pound restriction was imposed "because Ed Adams said he could not do heavier duty. There is no medical reason or objective finding that would limit his activities. From a medical standpoint, Ed Adams can work full-unrestricted duty."
On February 5, 2001, Dr. Burvant sent a letter to Ms. Blount, and stated that Mr. Adams's entire medical history had not been available at the time of his initial visit. After a consultation with Dr. Nutik, and an evaluation of the earlier treatment from Dr. Roca, Dr. Burvant related the neuropathy to the injury and said "the patient may need ulnar nerve transposition for ultimate treatment of this condition." Mr. Adams was given a note to return for medium duties and to avoid heavy lifting with the left hand. On March 14, Mr. Adams consented to the surgery.
On June 18, Dr. Burvant restated that following his change of opinion on the cause of the ulnar nerve symptoms, restrictions would not allow him to perform any type of heavy duty and should not lift more than 10 pounds with his lift hand.
The IME, Dr. Gordon Nutik, examined Mr. Adams in November, 2000, and opined that considering the ongoing symptoms, an EMG and nerve conduction studies, as well as other medical tests, were in order for *1291 diagnostic purposes. He noted that the patient had a history of recurring numbness of the left upper extremity while at work, but felt at that time that Mr. Adams was capable of modified duty. Later reports from Dr. Nutik concentrated on the absence of evidence for a herniated cervical disc. However, on January 24, 2001, Dr. Nutik wrote to FARA that there was evidence of ulnar nerve involvement at the left elbow. Dr. Nutik consulted with Dr. Burvant and determined that the latter did not have all of the medical records from Dr. Ross. On February 9, Dr. Nutik again wrote to the administrator, stating that "significance has to be given this patient's history", that the earliest treatment by Dr. Ross record showed Mr. Adams had suffered numbness in the left arm from the time of the injury. Dr. Nutik never recommended that Mr. Adams return to work in his former capacity, but felt that he was capable of light duty.
On appeal, Adams claims the following:
(1) Termination of TTD benefits on January 25, 2001 was arbitrary and capricious;
(2) Penalties and attorney fees are due for the late payment of SEB's, and for failure to timely authorize surgery pursuant to R.S. 23:1201(F);
(3) Legal interest is due on any amount to be paid herein as well as on the late SEB payments.
Under LSA-R.S. 23:1201.2, any employer or insurer who at any time discontinues payment of claims due, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of all reasonable attorney fees for the prosecution and collection of such claims. An award of attorney's fees in a workers' compensation case is essentially penal in nature, as it is intended to discourage indifference and undesirable conduct by employers and insurers. Attorney's fees should not be imposed in doubtful cases, where a bona fide dispute exists as to the employee's entitlement to benefits, and the mere fact that an employer loses a disputed claim is not determinative.[1] The test to determine whether the employee's right to benefits was reasonably controverted is whether, given the facts, medical and otherwise, known to the employer or his insurer, did the employer or insurer have a reasonable basis to believe that medical expenses and compensation benefits were not due the employee. Stated another way, did the employer or his insurer have sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant.[2] It has been held by our Supreme Court that the findings of a worker's compensation judge in favor on the defendant denying benefits is virtually conclusive that the actions of the defendant were reasonable and not arbitrary and capricious.[3] "... it would very rarely be appropriate for an appellate court to award attorney's fees based on employer actions which the trier of fact previously found did not rise to the level of being arbitrary and capricious (and in fact found to be meritorious)."[4]
Considering the evidence before the trial court, in particular the medical evaluations *1292 at that point, we see no error in the (implicit) finding of the trial court that Bayou had a bona fide dispute as to whether Adams was entitled to benefits at the time payments were discontinued in January of 2001, based on the information Bayou had at that time.
By denying all other relief, it appears that the court tacitly found no merit in Adams' contention that the SEB benefits paid on August 28, 2001 were not timely, as no reasons for judgment were given. Under LSA-R.S. 23:1201(F)(2), penalties are assessed against either the employer or the insurer for failure to commence payment of benefits, but does not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control. In brief to this court, Bayou avers that a reasonable factual basis existed for it to question the relationship between Adams' elbow injury and its relationship to the initial work injury. Additionally, Bayou urges that Adams failed to prove his entitlement to SEB benefits. However, Bayou has neither answered nor appealed the judgment which found that Adams was entitled to SEB commencing January 25, 2001 at the rate of $7.00 per hour, and the judgment on that issue is therefore final on that issue.
Because no reasons for judgment were given, we cannot determine the trial court's basis for denial of penalties and attorney fees. However, from the record it is clear that shortly after February 5, 2001, Bayou was aware of Dr. Burvant's opinion relating Adams' elbow condition to the work incident. Further, it is apparent from its correspondence with Dr. Nutik that Bayou was aware of his position relating the injury and accident shortly after his letter to them of February 9. Despite the absence of any medical evidence at that time that Adams' condition was not work-related, according to Ms. Blount, Bayou questioned the "mechanism" of the elbow injury because the initial complaint was to Adams' back. The matter was not "in litigation" until after March 5, 2001. Dr. Burvant recommended surgery in March and restated his opinion in June. After February 5, no physician released Adams to full unrestricted duty. Nevertheless, Bayou chose to delay payment of benefits until after Dr. Nutik's deposition in August of 2001, at which time his opinion relative to the cause of the elbow injury was unchanged. An unjustified belief that an employee's injury did not result from an accident does not excuse failure to pay worker's compensation benefits.[5] Workers' compensation handlers cannot blindly rely on earlier optimistic medical reports when presented with medical information showing disability.[6] In the absence of specific findings by the trial court regarding the reasonableness of Bayou's refusal to pay benefits after February, 20001, we find that the trial record does not evidence sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant, and to the extent that the trial court found otherwise, it was manifestly erroneous. Because the claim was not reasonably controverted, Adams is entitled to penalties and attorney fees under LSA-R.S. 23:1201.
An employer has the statutory duty to furnish all necessary and related medical expenses caused by a work-related *1293 injury. LSA-R.S. 23:1203. An employer's failure to authorize a medical procedure for an employee otherwise eligible to receive worker's compensation is deemed to be the failure to furnish compensation benefits, thereby triggering the penalty provisions of the Louisiana Worker's Compensation Act.[7] Failure to furnish benefits is permissible only when the claim has been "reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control." La. R.S. 23:1201(F)(2). Awards for penalties and attorney fees are governed by La. R.S. 23:1201(F).[8] Dr. Burvant indicated to Bayou in February that ulnar nerve transposition surgery may be necessary, but on March 14, Bayou received a recommendation for ulnar nerve transposition surgery which was accepted by Adams. The authorization stated that reasonable therapeutic alternatives failed to improve the condition. Because the need for such surgery was not reasonably controverted as we have found above, failure to approve surgery within sixty days of March 14 results in the imposition of penalties and attorney fees. Since both medical benefits and SEB were denied, Bayou is subject to penalties for both.[9]
Adams urges that he is entitled to interest on SEB payments which the worker's compensation judge found were due. According to LSA-R.S. 23:1201.3, any compensation awarded and payments thereof "directed to be made by order of the worker's compensation judge" shall bear judicial interest from the date compensation was due until the date of satisfaction. With regard to the portion of the judgment confirming its payment to Adams of SEB, Bayou correctly notes that R.S. 23:1201.3 is not applicable inasmuch as the benefits were paid prior to trial, not as a result of a court order. This assignment of error is without merit.
Counsel for Mr. Adams submitted an affidavit in support of attorney fees to which document Bayou objected. A ruling on its admissibility was deferred by the court, and never ultimately determined. The document was never profered by Adams, and we are unable to consider it on appeal as it is not properly before us.
Factors used in determining attorney's fees in workers' compensation cases are the degree of skill and ability exercised, the amount of the claim and the amount of time devoted to the case.[10] In the present case, we note that although Bayou eventually paid SEB benefits and ultimately authorized surgery, it did so after a rather protracted period, and just prior to trial on the matter. Consequently, once TTD benefits were discontinued, Adams was obliged to take a litigious stance in order to obtain compensation, and it is clear from the record that the attorney spent a considerable amount of time pursuing his client's case and vigorously enforcing his rights. Our review of the record convinces us that $1500.00 in attorney fees is appropriate in the present case. Additionally, a workers' compensation claimant is entitled to an increase in *1294 attorneys fees to reflect additional time incurred in defending an employer/carrier's (partially) unsuccessful appeal.[11] We find that $1500.00 is warranted as attorney fees for the appeal of this matter.
Accordingly, the judgment is reversed in part, and we hold that Adams is entitled to penalties because Bayou was arbitrary and capricious in failing to pay supplemental earnings benefits after February 5, 2001, and in failing to authorize surgery after March 14, 2001. We award penalties of $2000.00 for each instance. We award total attorney fees of $3000.00 in connection with the trial and appeal of this matter. In all other respects, the judgment is affirmed.
AFFIRMED IN PART; REVERSED IN PART; RENDERED.
NOTES
[1] J.E. Merit Constructors Inc. v. Hickman, 00-0943 (La.1/17/01), 776 So.2d 435.
[2] Ziegler v. Bagby Construction/LWCC 99-1120 (La.App. 5 Cir. 4/25/00),760 So.2d 513, 521; writ denied XXXX-XXXX (La.6/30/2000), 766 So.2d 544.
[3] Willis v. Alpha Care Home Health XXXX-XXXX (La.6/15/01),789 So.2d 567.
[4] Id., quoting J.E. Merit Constructors Inc. v. Hickman, supra.
[5] Nelson v. Roadway Exp., Inc., 588 So.2d 350 (La.1991); Cochennic v. Dillard's Dept. Store Warehouse, 95-705 (La.App. 5 Cir. 1/17/96), 668 So.2d 1161.
[6] Johnson v. Insurance Company of North America, 454 So.2d 1113 (La.1984); Scott v. Town of Jonesville, 96-41 (La.App. 3rd Cir.7/3/96), 676 So.2d 1196.
[7] Gay v. Georgia Pacific Corp., 32,653 (La. App. 2nd Cir.12/22/99), 754 So.2d 1101; Skipper v. Acadian Oaks Hosp., 00-67 (La.App. 3rd Cir.5/3/00),762 So.2d 122.
[8] Sims v. Sun Chemical Corp., 34,947 (La. App. 2nd Cir.8/22/01), 795 So.2d 439. Also see Skipper v. Acadian Oaks Hosp., supra.
[9] See e.g. Harvey v. BE&K Const. Co., 34,057 (La.App. 2nd Cir.11/15/00), 772 So.2d 949 writ denied XXXX-XXXX, (La.3/9/01), 786 So.2d 732.
[10] See Naquin v. Uniroyal, Inc., 405 So.2d 525 (La.1981); Benjamin v. Wal-Mart # 75, XXXX-XXXX (La.App. 3 Cir. 12/12/01), 801 So.2d 624.
[11] See Parker v. ADM Milling Co. 01-649 (La. App. 5th Cir.11/27/01) 804 So.2d. 120; Benjamin v. Wal-Mart # 75, supra.